Christine M. JONES *v.* Jerry A. JONES

CA 94-1022 907 S.W.2d 745

Court of Appeals of Arkansas
En Banc
Opinion delivered October 11, 1995
[Petition for rehearing denied November 22, 1995.]

*The Perroni Law Firm*, by: *Samuel A. Perroni* and *Mona J. McNutt*, for appellant.

*Helen Rice Grinder*, for appellee.

JOHN B. ROBBINS, Judge. On November 13, 1990, appellant Christine M. Jones and appellee Dr. Jerry A. Jones were divorced. The divorce decree incorporated a property settlement agreement which gave custody of their infant child, Cameron, to Ms. Jones and provided that Dr. Jones was to pay $2,000 per month in child support. On Sunday, December 13, 1992, the chancery court issued an emergency *ex parte* order which provided that Dr. Jones was not required to return Cameron to Ms. Jones following Dr. Jones' weekend visitation and that an emergency custody hearing would be scheduled. The emergency hearing was scheduled for December 16, 1992, and on December 18, 1992, the chancery court issued a temporary order changing custody of Cameron from Ms. Jones to Dr. Jones pending a final hearing. A trial was held in February 1994 for the purpose of hearing Dr. Jones' petition for a permanent change of custody. After the trial, the chancery court determined that there had been a material change in circumstances which warranted a change in custody from Ms. Jones to Dr. Jones. In its order, the court allowed Ms. Jones liberal visitation rights and abated Dr. Jones' child support obligation. Specifically, the chancery court relied on its finding that Ms. Jones was unable to provide for Cameron's emotional needs; that Dr. Jones lived in Conway, which is a much safer environment than Little Rock, where Ms. Jones had recently relocated; and that Dr. Jones had recently remarried and could provide a more stable home than Ms. Jones, who remained single.

For reversal, Ms. Jones raises numerous arguments pertaining to each of the three custody proceedings. She first argues that the trial court exceeded its authority in conducting a child custody hearing on Sunday, December 13, 1992, and abused its discretion in changing custody based upon ex parte communications. As to the December 16, 1992, emergency hearing, Ms. Jones contends that she was not given adequate notice of the hearing as is required by the due process clause of the Fourteenth Amendment, and that the manner in which the hearing was conducted deprived her of due process of law. Ms. Jones also argues that the trial court erred in awarding an emergency change of custody after the hearing because there was insufficient evidence that Cameron was in danger or that it was detrimental for Cameron to be in the custody of Ms. Jones. In addition, Ms. Jones chal-

lenges the sufficiency of the evidence with regard to the permanent change of custody to Dr. Jones. She asserts that the trial court's finding that "it question[ed] [Ms. Jones'] ability to adequately provide an emotionally stable and wholesome home for the child" indicated a clearly erroneous standard, and that the trial court abused its discretion in finding that her move from Conway to Little Rock was a substantial change in circumstances supporting a change in custody. Ms. Jones further asserts that the trial court abused its discretion in concluding that the remarriage of Dr. Jones, the subsequent birth of a child, and the presence of a stepson was a significant change of circumstances justifying a change of custody. Finally, Ms. Jones argues that the chancellor abused his discretion in refusing to recuse.

We first note that all of Ms. Jones' arguments which pertain to the temporary custody orders are now moot and need not be addressed by this court. It is well settled that a temporary order is terminated upon entry of a subsequent permanent order. *Vairo* v. *Vairo*, 27 Ark. App. 231, 769 S.W.2d 423 (1989). The rights of the parties in the present litigation have been settled by the final award of custody, and a decision on the merits of the temporary awards would have no practical effect on the rights of the parties. *See id.* However, because error by a chancellor in granting or denying ex parte emergency relief incident to an action seeking a change of custody is virtually always moot and evades review, we will use this occasion to briefly address appellant's contention that the ex parte order here should not have been entered. *See Wright* v. *Keller*, 319 Ark. 201, 203, 890 S.W.2d 271, 272 (1995).

We acknowledge that the matter of emergency ex parte applications in child custody proceedings must be one of the most difficult areas of a chancellor's jurisdiction. This is so because ex parte decision-making is contrary to the basic premise of our justice system that an adversarial presentation of a controversy will result in a better reasoned, and hopefully correct, decision. However, because of the harm which can so quickly be suffered by a helpless child, emergency measures without an adversarial presentation are sometimes necessary to terminate or avoid a perceived harmful situation. While divining the truth can be difficult in adversarial proceedings, it is even more difficult when a chancellor has an ex parte petition and affidavits sud-

denly thrust upon him. The risk and consequence of erring in rendering ex parte protection to a child can appear to be of lesser gravity than the harm which might result if relief is denied.

██ The procedural method employed by Dr. Jones in seeking emergency custody of the minor child without notice to Ms. Jones, as the custodial parent, is found only under Rule 65 of the Arkansas Rules of Civil Procedure. This rule provides for injunctive relief where irreparable harm or damage will or might result if such relief is not granted. Section (a)(1) of the rule requires the court to decide the merits of an ex parte request for relief on the basis of assertions of fact contained in supporting affidavits or a verified complaint. Here, Dr. Jones' request for emergency ex parte relief was supported by four documents: Dr. Jones' verified petition and affidavit, a letter from Dr. Gayle Harrison, and a letter from Dr. Justin Ternes. Because the letters from Dr. Harrison and Dr. Ternes were not under oath they could not constitute affidavits. Ark. Code Ann.§ 16-40-103(b). The fact that these letters were attached as exhibits to Dr. Jones' verified petition for relief does not bootstrap them into affidavits, and they should not have been considered by the chancellor. This leaves only Dr. Jones' verified petition and affidavit. When the hearsay statements of Dr. Harrison and Dr. Ternes are disregarded, the only remaining allegations of fact addressing the need for relief could only support, if proven, a change of custody after notice and a hearing on the merits, but fall short of establishing such an emergency that irreparable harm would or might result if immediate ex parte relief was not granted. We believe that the chancellor erred by granting ex parte relief under these circumstances.

██ Although Rule 65 provides for relief without written or oral notice to the adverse party *or his attorney* where the requisite proof of emergency is shown, we believe the better practice is to give oral notice to the adverse party's attorney, if known and available to receive such notice, prior to submission of the ex parte request. Many times the adverse party may not have retained an attorney at this stage of the proceeding. However, if the ex parte request is incident to a change of custody following an earlier custody award, the attorney who represented the adverse party in the earlier proceeding should be notified unless the earlier proceeding occurred in the distant past. Dr. Jones' petition

for ex parte relief was submitted to the chancellor on December 13, 1992. The record reflects that the parties' divorce was granted by decree filed November 13, 1990, some twenty-five months earlier, at which time Ms. Jones was represented by an attorney, Thomas S. Stone. Notice was not given Mr. Stone of the ex parte proceeding.

■ Ms. Jones also argues on appeal that the chancellor erred by considering the petition for ex parte relief and signing the resulting order on a Sunday, citing Ark. Code Ann.§ 16-10-114 and *Chester* v. *Arkansas Board of Chiropractic Examiners*, 245 Ark. 846, 435 S.W.2d 100 (1968). Dr. Jones responds to this by denying the applicability of § 16-10-114 to emergency ex parte proceedings, but arguing that even if it is applicable then it is unconstitutional. Because we have found on other grounds that the ex parte order should not have been granted, we will not reach this constitutional issue. *See Board of Equalization* v. *Evelyn Hills Shopping Ctr.*, 251 Ark. 1055, 476 S.W.2d 211 (1972).

For the same reason we addressed the appellant's argument about the propriety of the ex parte order, we will briefly consider appellant's contention that the chancellor also erred in granting the temporary change of custody order. A hearing was held on December 16, three days after issuance of the ex parte order. While appellant argues that notice was received less than forty-eight hours prior to the hearing, and that she was not given sufficient time to arrange for several other witnesses to testify on her behalf, appellant neither moved to reset the hearing nor to continue the hearing at the conclusion of her proof.

■ Appellant contends that the evidence before the chancellor was insufficient to support a temporary change of custody. Appellee testified and called Dr. Gayle Harrison, a psychologist, and Dr. Justin Ternes, a child psychiatrist, as witnesses. Appellant testified and called her sister, Dr. Cathleen Burgess, an anesthesiologist, and her pastor, Dr. Arnold Murray. On rebuttal, appellee called Tina Verser, a nurse employed by appellee. The facts were in sharp dispute. However, appellee's expert, Dr. Harrison, expressed her opinion that the child had an adjustment disorder with disturbances of emotion and conduct, and had been traumatized while in the mother's custody. While there was evidence to the contrary, in child custody cases we defer to the supe-

rior position of the chancellor in assessing credibility of the witnesses. *Bennett* v. *Howell*, 31 Ark. App. 209, 792 S.W.2d 338 (1990). While we may have made a contrary decision, we cannot conclude that the chancellor's determination to place custody of the child with appellee on an interlocutory basis was clearly erroneous.

We are primarily concerned with Ms. Jones' three arguments pertaining to the final custody determination, as well as her argument that the chancellor erroneously refused to recuse from this case. Ms. Jones takes issue with the final custody award, arguing that the trial court's decision to change custody was clearly against the preponderance of the evidence. Specifically, she attacks the trial court's reliance on each of three changes of circumstances upon which the court determined that a change of custody was warranted. This court has stated many times that a material change in circumstances must be shown before a court can modify an order regarding child custody, and the party seeking modification has the burden of showing a change in circumstances. *Snisky* v. *Whisenhunt*, 44 Ark. App. 13, 864 S.W.2d 875 (1993). The best interest of the child is the polestar for making judicial determinations concerning child custody matters. *Welch* v. *Welch*, 5 Ark. App. 289, 635 S.W.2d 303 (1982). On appeal from chancery court cases, this court considers the evidence de novo, but the chancellor's decision will not be reversed unless it is shown that his decision is clearly against a preponderance of the evidence. *Rogers* v. *Rogers*, 46 Ark. App. 136, 877 S.W.2d 936 (1994).

The first change of circumstances relied on by the chancellor related to his finding that "[w]hile [Ms. Jones] has proven that she is able to function adequately and competently in most areas of her social and work life, the Court questions [her] ability to adequately provide an emotional, stable and wholesome home for the child." Ms. Jones argues that this finding erroneously shifted the burden of proof away from Mr. Jones and in effect forced her to prove her case beyond question. Ms. Jones also argues that the finding that she is unable to adequately provide a stable home is clearly against the preponderance of the evidence.

We find that the burden of proof was not shifted

to Ms. Jones in this case. Rather, the chancellor was merely expressing his concern for the welfare of the child when he announced his uncertainty regarding Ms. Jones' ability to provide a stable home. The record, in fact, does contain evidence that Cameron was suffering emotionally while in Ms. Jones' custody and that Ms. Jones had a history of mental problems. Dr. Avam Jeffery Zolten, Directory of Psychology Services at the Family Guidance Center, examined Ms. Jones and testified that she exhibited paranoid behavior. Dr. Zolten also expressed concern as a result of Ms. Jones' statement that she could tell her son not to do something in a certain tone of voice and he would run to the corner and start crying. Drs. Gayle Harrison and Becky Porter both rendered psychological treatment to Cameron, and both expressed an opinion that Cameron had been traumatized by a female authority figure and that Christy Jones' home presented an unstable environment for Cameron. Dr. Jones testified and expressed concern because Ms. Jones had been discussing serpents, demons, and death with Cameron and that she would have the child participate in exorcism rituals of cleansing her home of these plagues; and that Ms. Jones told him in Cameron's presence that she "heard snakes under the house and they were turning" and "when the snakes are turning, that means evil is on its way, and you're evil."[1] Finally, Dr. William Siegal testified that he diagnosed Ms. Jones as having a borderline personality disorder approximately seven years before the final custody hearing and there was evidence that, prior to the birth of Cameron, Ms. Jones had attempted suicide on three occasions. Although these two factors predate the original custody award and do not constitute a change of circumstances, a judicial award of custody may be modified upon a showing of facts affecting the best interest of the child that were not presented to the chancellor or were not known by the chancellor at the time the original custody order was entered. *Stamps* v. *Rawlins*, 297 Ark. 370, 761 S.W.2d 933 (1988). While it is true that there were medical opinions in this case that tended to show the fitness of Ms. Jones as a parent, this court defers to the superior position of the chancellor in determining credibility of witnesses, particularly in child custody cases. *See Bennett*

---

[1]The record does not reflect that Ms. Jones disputed this testimony. In fact, the record does not reflect that Ms. Jones testified at all over the course of the four-day final hearing.

v. *Howell, supra.* The chancery court was entitled to give credence to the evidence indicating that Ms. Jones' custody of Cameron was detrimental to the child, and its reliance on this evidence in changing custody was not clearly against the preponderance of the evidence.

 Ms. Jones next argues that the trial court abused its discretion in holding that her move from Conway to Little Rock and her husband's remarriage constituted substantial changes of circumstances supporting a change of custody. We cannot agree. There was evidence presented that Ms. Jones' home in Little Rock is in a higher crime area than Dr. Jones' home in Conway. This is a legitimate factor to be considered in determining what is in the best interest of the child. Remarriage of one of the parties is also a factor to be considered when deciding what is in a minor child's best interest. *See Roland* v. *Roland*, 43 Ark. App. 60, 859 S.W.2d 654 (1993). In the case at bar, Dr. Jones remarried and has a stable family unit consisting of himself, his wife, Cameron's half brother, and Cameron's stepbrother. The chancery court did not abuse its discretion in taking this change of circumstances into account. Furthermore, in light of all of the material changes in circumstances, we find no error on the part of the court in its decision to change custody.

The remaining issue in this case is whether the chancery judge erroneously refused to recuse. Ms. Jones essentially contends that the chancery judge should have recused because his impartiality was put into question when he entered the emergency *ex parte* custody order. Ms. Jones also argues that the judge indicated bias when, prior to the emergency custody hearing held three days after the *ex parte* order, he refused to allow her to take Cameron to an independent psychiatrist for an examination without court approval.

 Judges are presumed to be impartial and the party seeking disqualification bears a substantial burden proving otherwise. *Chancellor* v. *State*, 14 Ark. App. 64, 684 S.W.2d 831 (1985). Disqualification of a judge is discretionary with the judge himself, and his decision will not be reversed absent an abuse of that discretion. *Korolko* v. *Korolko*, 33 Ark. App. 194, 803 S.W.2d 948 (1991). Although we agree that the chancery judge in this case erroneously issued the emergency ex parte order, we do not

find that this or any other action taken by the judge rose to the level of putting his impartiality at issue. We find no abuse of discretion in the judge's refusal to recuse.

Affirmed.

PITTMAN, J., concurs.

ROGERS, J., dissents.

JOHN MAUZY PITTMAN, Judge, concurring. I concur in the result reached in this case. While I agree that the *ex parte* order was subsumed by the final order and is not itself vulnerable, I do wish to comment on the problems inherent with *ex parte* orders.

When there is imminent danger of harm to the child, there is a place in our jurisprudence for issuance, without notice, of emergency *ex parte* relief of short duration. Such emergencies would generally be the same as those constituting dependency, but for the availability of a fit parent to assume custody.[1] Courts should not change custody on an *ex parte* basis in the absence of a showing that, unless *ex parte* modification is ordered, the child is subject to immediate harm.

Application for an *ex parte* order should be accompanied by affidavits setting forth detailed facts supporting the need for such relief. When possible, affidavits from physicians or mental health professionals explaining the need for an immediate change should be obtained. It is very important for the attorney to allege specific facts warranting emergency jurisdiction. Moreover, "[u]nless imperative, the court should not rely on ex parte statements for proof of the existence of an emergency." *Wolfberg* v. *Noland*, 222 P.2d 426, 427 (Colo. 1950).

*Ex parte* communications deprive the absent party of the right to respond and be heard, suggest bias or partiality on the part of the judge, can be misleading, and, at the very least, expose

---

[1]For example, a juvenile believed to be dependent-neglected may be removed from parental custody by issuance of an ex parte order for emergency custody. Ark. Code Ann. § 9-27-314(a) (Repl. 1993). A "dependent-neglected juvenile" means one "who as a result of abandonment, abuse, sexual abuse, sexual exploitation, neglect, or parental unfitness is at a substantial risk of serious harm." Ark. Code Ann. § 9-27-303(12) (Repl. 1993).

the judge to one-sided argumentation, which carries with it the attendant risk of an erroneous ruling. At worst, *ex parte* communications are an invitation to improper influence. Therefore, I also believe that such orders should not issue unless a showing is made that it is impractical to serve or otherwise notify, even informally, the opposing party or his or her attorney so that that party can participate.

JUDITH ROGERS, Judge, dissenting. I dissent. The chancellor's decision is clearly contrary to a preponderance of the evidence, and the affirmance of it promotes an injustice. It is rare that a custody decision is reversed on appeal and rightly so, given our standard of review and the deference afforded chancellors on such a sensitive and fact-intensive issue. However, we should not hesitate or lack the courage to do so in an appropriate case. This is such a case.

The parties to this action were divorced in November of 1990 and custody of their minor child was placed with Christie Jones. Dr. Jones remarried five months after the parties' divorce. In 1991, Christie Jones obtained a job as a registered nurse with Dr. James Billie in Little Rock. Consequently, she moved to Little Rock and purchased a home in the Hillcrest neighborhood.

This tragedy began to unfold in April of 1992, when Dr. Jones took the parties' two-year-old son to Dr. Justin A. Ternes, a friend and classmate, for a psychological evaluation. This action was seemingly prompted by Dr. Jones' concern that Christie Jones' was exerting some sort of detrimental influence on the child; however, Christie Jones was not made privy to this concern, nor was she advised that the child was being taken to a psychiatrist. Dr. Ternes recommended that Dr. Jones pursue further evaluation and possible treatment for the child. Christie Jones was similarly uninformed that Dr. Ternes had recommended any treatment for her son. Despite Dr. Ternes' advice, it was not until *three months later*, in July of 1992, that Dr. Jones began taking the child to the psychologist who had been recommended by Dr. Ternes, Dr. Gayle Harrison. Again, Christie Jones was not informed or even consulted. The child was seen by Dr. Harrison for five months before Christie Jones was finally notified of her son's alleged condition by means of an *ex parte* order removing the child from her custody.

The circumstances surrounding the issuance of the *ex parte* order reflect a clear abuse of the judicial system. According to Dr. Harrison, the child had been doing well over the five-month period of examination and evaluation. In her deposition, Dr. Harrison stated that she had not once observed the kind of behaviors reported by Dr. Jones (slapping, biting and hitting himself). I find it extremely interesting that Dr. Harrison's opinion changed so abruptly. The record clearly shows that Dr. Jones and his attorney, Helen Grinder, met with Dr. Harrison concerning a change in custody just one week before the doctor suggested, by way of letter to the court, that the child remain with Dr. Jones. Thus, suddenly, one week after Dr. Jones and his attorney visited with Dr. Harrison, Dr. Harrison observed that the child had regressed to the point that the child needed to remain with his father. Apparently, Dr. Harrison found this to be such a traumatic situation that she personally felt the need to contact the chancellor involved in the parties' divorce. However, the record indicates that it was not such an emergency as Dr. Harrison indicated in her letter. The record shows that Dr. Harrison visited with the child on Thursday. It was not until Friday afternoon, at approximately 4:30 p.m., that a letter was faxed to Judge McNeil from Dr. Harrison. It is also clear from the evidence that Judge McNeil closes his court at 4:30 p.m. Another interesting fact is that Dr. Ternes, who had not examined the child in over five months, also sent a letter to the chancellor proclaiming the need for an emergency change in custody. However, the letter was faxed to Ms. Grinder's office and not Judge McNeil's office. With this supposed ammunition in hand, Ms. Grinder located Judge McNeil on Sunday morning. Christie Jones was not served with notice until later that afternoon at 4:45 p.m.

When this evidence is viewed from beginning to end, it is apparent that the actions of Dr. Jones, with the aid of friendly experts and his attorney, were aimed at manipulating the court system by first manufacturing an emergency situation, when none really existed, and by presenting the matter at a time when Christie Jones would be without the opportunity to present her position. The effect of these machinations cannot be minimized or ignored as these acts set the tone for the entire proceedings and wrongfully gave Dr. Jones a tactical advantage by placing Christie Jones in a defensive posture, when it was Dr. Jones' burden to prove the necessity of a change in custody.

The majority glosses over these facts, but does ultimately hold that the chancellor erred in transferring custody on an *ex parte* basis. While I agree that the issue should not be considered moot, I find the majority's reliance on Rule 65 of the Rules of Civil Procedure wholly unsatisfactory, yet I cannot disagree with the result obtained. And, although I believe that appellant's argument concerning the issuance of an order on a Sunday in violation Ark. Code Ann. § 16-10-114 (1987) merits discussion, I am also not comfortable addressing that question as its resolution would require certification to the supreme court under Rule 1-2(a)(3) of the Rules of the Supreme Court and Court of Appeals. Perhaps this case should have been certified in any event, since the supreme court has decided a previous appeal involving these parties, *Jones* v. *Jones*, 320 Ark. 449, 898 S.W.2d 23 (1995). Ark. R. Sup. Ct. 1-2(a)(11).

Turning now to the chancellor's award of custody to Dr. Jones on a permanent basis, the standard of review is well settled in child custody cases. Before an order awarding custody can be changed there must be proof of material facts which were unknown to the court at the time or that the conditions have so materially changed as to warrant modification and that the best interest of the children requires it. The burden of proving such change is on the party seeking the modification. *Watts* v. *Watts*, 17 Ark. App. 253, 707 S.W.2d 777 (1986). The best interest of the child is the polestar for making judicial determinations concerning child custody matters. On appeal from chancery court cases, this court considers the evidence de novo, but the chancellor's decision will not be reversed unless it is shown that his decision is clearly against a preponderance of the evidence. *Larson* v. *Larson*, 50 Ark. App. 158, 902 S.W.2d 254 (1995).

Although we, as appellate judges, are obligated to follow our standard of review, we should not hide behind that standard when confronted with a case involving a crystalline effort on the part of the non-custodial parent to obtain custody of a child without legal or factual justification. The chancellor's decision in this matter is so clearly against any preponderance of the evidence that it should not be allowed to withstand appellate review. I would reverse the decision and reinstate custody of the child with Christie Jones.

Although the chancellor heard unrefuted evidence that Christie Jones was not unfit or unable to care for the child, reasons were found to change custody. The final order identified three circumstances: "plaintiff's move to the higher crime area of Little Rock, the inability of plaintiff to provide for the emotional needs of the child and the stability of the family situation of defendant, as compared to that of the plaintiff."

First, with regard to Christie Jones' residence, she moved to Little Rock after obtaining a job there, and she purchased a home in the Hillcrest neighborhood. At the hearing, Dr. Jones presented only a statistical comparison showing that Hillcrest had a higher crime rate than Conway. Without statistical data, common sense would indicate that the crime rate would be higher in an urban area as compared to a small town. That is not to say, however, that the Hillcrest area is particularly dangerous or that the child was in peril by living there. Dr. Jones' characterization of the neighborhood as a "war zone" is simply without evidentiary support. As such, this does not constitute a material change in circumstance. Moreover, such provincialism should not serve as the basis for a change in custody.

I also do not find Dr. Jones' remarriage a persuasive reason to change custody. Dr. Jones married his present wife five months after the divorce, and he admitted that their relationship antedated the parties' divorce. In fact, the record discloses that his wife was the labor nurse who attended the delivery of the parties' child. In short, Dr. Jones' remarriage does not impress me as being a material change in circumstance. I would not stigmatize the tough job of a single parent by giving preference to a new, unfamiliar family unit.

Lastly, there is no cogent evidence appearing in this record that Christie Jones was unable to provide for the emotional needs of the child. In affirming, the majority states that the record reflects that Christie Jones had a history of mental problems. "History" is the operative word which demonstrates the erroneous nature of this finding in that the problems she experienced occurred in the distant past, some seven years prior to the hearing. The record indicates that her emotional problems were associated with guilt she felt for aborting a child conceived by the parties during the marriage. With regard to this matter, Christie Jones

reported to Dr. Gallien, the court appointed psychiatrist, that Dr. Jones had forced her to have the abortion.

Be that as it may, there is no evidence in this record that she currently suffered from any mental difficulties. Although the majority refers to Dr. Zolten's testimony that she exhibited paranoid behavior, the majority ignores that Dr. Zolten also testified that he could understand why she would be paranoid since her attorneys had cautioned her with regard to the evaluation. I, too, can understand why she and her attorneys would be leery of these proceedings, given the way that the *ex parte* order was handled.

With respect to the child's emotional well-being, the majority refers to the opinions of Drs. Harrison and Porter that Cameron had been traumatized by a female authority figure and that his mother's home presented an unstable environment for him. However, neither of those individuals ever met with or examined Christie Jones. Also, the child's reaction to being verbally reprimanded does not establish that the child was suffering emotionally while in Christie Jones' custody. Moreover, the majority's reliance on the testimony of Dr. Jones is misplaced. His testimony is inherently suspect.

The testimony presented at the final hearing did not prove that Christie Jones was an unfit mother or that her depression years earlier had *any* effect on her ability to care for her child. There was no showing that Christie Jones had borderline personality disorder or severe depression at the time of her divorce, at the time of this hearing, or over the *past seven years*. The court appointed psychiatrist, Dr. Gallien, testified that the child should remain with his mother. She said that the child would suffer severe trauma if custody were changed because he would be taken from his mother who had raised him for two years. Dr. Gallien also criticized Dr. Harrison's *ex parte* communication with the chancellor. According to Dr. Gallien, this conduct both constituted and resulted in a "travesty of justice." I agree with that assessment and am troubled that the transparency of this entire matter is being disregarded by the majority.

It is clear that Christie Jones had provided for the emotional needs of her child from the time her son was born, through the divorce, and continuing to the time of the present hearing, a period of approximately three years. The chancellor awarded

40

Christie Jones extremely liberal visitation, and I think that fact alone shows that the chancellor was not persuaded that Christie Jones was an emotional threat to her son.

Christie Jones also argues, and I agree, that the chancellor shifted the burden of proof in this case. The chancellor sets out in his opinion that he could not find that Christie Jones had borderline personality disorder, as Dr. Jones had claimed. However, he noted in his final order that Christie Jones *had proven* that she was able to function in the work environment and socially, but he *still questioned* her ability to provide for her child. The majority finds that the chancellor was merely expressing his concern for the welfare of the child. I disagree. The chancellor was not merely expressing a concern; he was making a decision with regard to the custody of a child. An examination of the record shows that the chancellor shifted the burden of proof after the *ex parte* order and the temporary order transferring custody, and during the final hearing. It is clear from the record that the onus was placed on Christie Jones to prove her fitness as a parent in light of Dr. Jones allegations. In a footnote, the majority observes that Christie Jones did not testify and thus did not dispute Dr. Jones' testimony alleging bizarre behavior on her part. This demonstrates that the majority is working under the same mistaken impression as the trial court as to the burden of proof. The burden of proof was on Dr. Jones to show a material change in circumstance. Under this standard, Christie Jones had nothing to prove and was not required to testify. I note that she could just as easily have been called as a witness by Dr. Jones in his effort to meet his burden. I think it telling that he did not do so. The misplacement of the burden of proof, standing alone, requires that the case be reversed.

I cannot condone, and this court should not condone, the irregularities which occurred in this case. The chancellor, and now this court on appeal, have seized upon reasons to justify a change in custody which are, at best, specious, and do not constitute material changes in circumstance. According to a minister who served as the parties' counsellor, Dr. Jones said in 1992 that he would take the child away from Christie Jones if she did not accommodate his desire for increased visitation with the child. Also according to the minister, Dr. Jones intimated that he would be successful in this effort since he had more money

than she did. These are telling statements, and are, I fear, at the heart of this entire matter. No court should allow itself to be manipulated in the manner which was accomplished here, and no court should bend to the whims and desires of one parent. Custody decisions are simply not to be made on this basis. Regrettably, Dr. Jones has succeeded in his effort to gain custody, at the expense of the child. We ought to reverse.