Christine M. JONES *v.* Jerry A. JONES

95-1150 931 S.W.2d 767

Supreme Court of Arkansas
Opinion delivered November 4, 1996

*The Perroni Law Firm, P.A.*, by: *Samuel A. Perroni* and *Carla Nadzam*, for appellant.

*Grinder Law Firm*, by: *Helen Rice Grinder*, for appellee.

BRADLEY D. JESSON, Chief Justice. This is a child-custody modification case. On Sunday morning, December 13, 1992, after receiving *ex parte* letters from a psychologist and psychiatrist employed by appellee Dr. Jerry A. Jones, the chancellor entered an emergency order providing that Dr. Jones was not required to return the parties' minor child, Cameron, to the custodial parent, appellant Christine Jones. Two additional *ex parte* orders and one *ex parte* communication later, Ms. Jones was also deprived of weekday visitation. Following yet a fourth *ex parte* order and a hearing on Dr. Jones's petition for permanent change of custody, the chancellor found that the following changes in circumstance warranted changing custody to Dr. Jones: (1) Ms. Jones was unable to provide for Cameron's emotional needs; (2) Ms. Jones had moved from Conway, where Dr. Jones lived, to the higher crime area of Little Rock; and (3) Dr. Jones had recently remarried and thus had a more stable family situation. Ms. Jones appealed, and the Court of Appeals affirmed the chancellor's ruling in *Jones* v. *Jones*, 51 Ark. App. 24, 907 S.W.2d 745 (1995). We granted review pursuant to Ark. Sup. Ct. R. 1-2(a)(11) and (f)(1), as we have decided a previous appeal involving the parties. *See Jones* v. *Jones*, 320 Ark. 449, 898 S.W.2d 23 (1995). Upon a *de novo* review of the entire record, we conclude that the chancellor erred in shifting the burden of proof away from Dr. Jones, the party seeking modification, to require Ms. Jones to prove her ability to adequately provide an emotional and stable home environment for the child. When viewing the erroneous shifting of the burden of proof on this issue together with the chancellor's faulty reliance on Ms. Jones's move to Little Rock and Dr. Jones's remarriage as material changes in circumstances, we must conclude that the chancellor's decision to change custody to Dr. Jones was clearly erroneous. For the reasons set forth below, we reverse and remand with instructions to reinstate the original custody order.

The one-sided nature of these proceedings requires a detailed recitation of the facts. The parties' son, Cameron, was born on October 27, 1989. Dr. Jones, an OB-GYN physician, participated in his son's delivery, as did his current wife, Diana, who was the labor nurse. While Diana's and Dr. Jones's relationship began in September 1990, Dr. Jones and Christine Jones were not divorced until November 13, 1990, just shortly after Cameron's first birthday. The divorce decree awarded custody of Cameron to Ms. Jones, provided that Dr. Jones was to pay $2,000.00 per month in child support, and required that both parties communicate and correspond with each other regarding Cameron's health, education, and welfare. The following April, Dr. Jones and Diana, who had custody of a child from a previous marriage, were married. That same year, Christine Jones, also a nurse, got a job with a Little Rock doctor and moved to Little Rock. Dr. Jones opposed the move and offered Ms. Jones $20,000.00 for down payment on a house if she would stay in Conway. According to the parties' counselor, Arnold Murray, Dr. Jones told him in January of 1992 that, if Ms. Jones did not allow him more visitation with Cameron, he would take her to court and take the child away from her because he had more money to pursue the case than she did.

In April of 1992, without informing Ms. Jones, Dr. Jones took Cameron to his friend and medical school classmate, Dr. Justin A. Ternes of Fayetteville, for an evaluation. Dr. Jones related to Dr. Ternes that Cameron had been biting and hitting himself. Dr. Ternes recommended that Cameron see Dr. Gayle Harrison, a developmental psychologist in Little Rock. Dr. Harrison began seeing Cameron in August of 1992. After observing him for five months, Dr. Harrison noted that Cameron was making progress. Sometime in November of 1992, Dr. Jones told Dr. Harrison that he was thinking of getting custody of Cameron. On November 13, Dr. Harrison spoke with Dr. Jones's attorney, Helen Rice Grinder, by telephone. On December 3, Ms. Grinder went to Dr. Harrison's office, at which time Dr. Harrison noted on her file that Dr. Jones planned to seek permanent custody. The following Thursday, December 10, Dr. Harrison saw Cameron and determined that he had regressed to the point that he needed to remain with Dr. Jones. Approximately 4:30 p.m. the next day, Dr. Harrison faxed a letter directly to the chancellor. In her letter, Dr. Harrison reported that Dr. Jones had brought Cameron to her office after having picked him up from Ms. Jones's home. She observed that Cameron's be-

havior had significantly regressed, as he had hidden in a corner, was withdrawn, fearful, clingy, hypervigilant, and unusually disorganized. Dr. Harrison attributed the cause of this behavior to Christine Jones, for Dr. Jones had told her the child had just come from her home.

After receiving a copy of Dr. Harrison's letter, Ms. Grinder requested a letter from Dr. Ternes. Dr. Ternes, expressing a similar concern that an emergency change in custody was necessary, composed a letter to the chancellor and faxed it to Ms. Grinder's office. On Sunday morning, December 13, 1992, Dr. Jones attached these letters to his petition and affidavit for permanent change of custody and emergency *ex parte* relief. The chancellor issued an emergency order providing that Dr. Jones was not required to return Cameron to Ms. Jones. On December 14, Ms. Jones received notice that an emergency custody hearing would be held on December 16. This was the first time she learned that Cameron was receiving therapy.

Following a brief hearing on December 16, the chancellor concluded that there was *some* evidence of danger to Cameron and ruled that temporary custody would be placed with Dr. Jones. However, in contravention to his finding that Ms. Jones posed a danger to Cameron, the chancellor expressed his desire that the parties settle their custody dispute before the Christmas holidays and announced that Ms. Jones would be awarded "standard" visitation. On December 18, without first submitting the proposed precedent to Ms. Jones's counsel, the chancellor entered a second *ex parte* order, prepared by Dr. Jones's counsel, which provided that Ms. Jones's weekday visitation was subject to Dr. Harrison's review and that Ms. Jones was not to take Cameron to any other psychologists or psychiatrists without court approval. The order also abated Dr. Jones's $2,000.00 per month child-support obligation. Despite Ms. Jones's objection to the *ex parte* nature of these proceedings, the chancellor entered yet a third *ex parte* order on January 4, 1993, revoking her weekday visitation. This order was precipitated by Dr. Harrison's second *ex parte* communication to the chancellor recommending that transitional situations be kept to a minimum to avoid detriment to the child.

On January 14, 1993, Ms. Jones filed a motion asking the chancellor to reconsider his three *ex parte* orders and to recuse from the case. Without ruling on the recusal issue, the chancellor sent a letter to the parties on March 22, indicating that he was granting

Dr. Jones's request that Dr. Wrenda Gallien be appointed to perform a psychological examination of Diana and him. The chancellor issued a fourth *ex parte* order on April 20, in which he appointed Dr. Gallien's firm, the Family Guidance Center, to compare parenting abilities of Dr. Jones, Diana Jones, and Christine Jones. The order made no provision for the testing of Cameron.

The final hearing on Dr. Jones's permanent-custody petition began on February 15, 1994. On March 7, the chancellor entered a written order granting Dr. Jones's petition on the basis of three factors: (1) Ms. Jones was unable to provide for Cameron's emotional needs; (2) Ms. Jones had moved from Conway, where Dr. Jones lived, to the higher crime area of Little Rock; and (3) Dr. Jones had recently remarried and thus had a more stable family situation.

 In reviewing chancery cases, we consider the evidence *de novo*, but will not reverse a chancellor's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. ARCP 52(a). Generally, courts impose more stringent standards for modifications than for initial determinations of custody. Jeff Atkinson, *Modern Child Custody Practice*, § 9.02 at 452 (1986). In Arkansas, child custody is determined by what is in the best interests of the child, and it is not altered absent a material change in circumstances. *Purtle* v. *Committee on Professional Conduct*, 317 Ark. 278, 878 S.W.2d 714 (1994); Ark. Code Ann. § 9-13-101 (Repl. 1993). The majority of states follow this approach. Atkinson, *Modern Child Custody Practice*, § 9.05 at 458. Using these basic principles as guideposts, we will now discuss separately the three changes in circumstances on which the chancellor relied.

### Christine Jones's move to Little Rock

Ms. Jones challenges the chancellor's finding that her move from Conway to the Hillcrest area in Little Rock constituted a material change in circumstances. At the final hearing, Dr. Jones presented the testimony of Jim King, a private investigator he had employed to complete a crime-statistical comparison of his and Ms. Jones's respective neighborhoods. King looked at a ten-block area of Ms. Jones's Hillcrest neighborhood and a ten-block area of Dr. Jones's Pippinpost neighborhood in Conway. Having gathered statistics from the Arkansas Crime Information Center, King testified, over Ms. Jones's objection, that a person was "99 percent more

likely to become a victim of crime in the Little Rock area than in the Conway neighborhood." Finally, King characterized the Hillcrest neighborhood as a "war zone." While the chancellor was evidently persuaded by Dr. Jones's argument, we find it lacking in both legal and factual support.

■ Under Dr. Jones's theory, the parent living in the statistically safer neighborhood, town, or city should have an advantage in custody disputes. This has never been the law in Arkansas, and we refuse to make such an inequitable principle part of our jurisprudence. In determining support awards, we have encouraged divorced spouses to acquire financial independence. For example, we have held that a court, under proper circumstances, may impute an income to a spouse according to what could be earned by the use of his or her best efforts to gain employment suitable to his or her capabilities. *Grady* v. *Grady*, 295 Ark. 94, 747 S.W.2d 77 (1988). In this case, Ms. Jones, in an effort to support herself and her child, moved to Little Rock after obtaining a job there. Thus, it would be inconsistent for us to allow our courts to impose a custody penalty as a price of compliance with our policy of encouraging economic autonomy.

In *Ising* v. *Ward*, 231 Ark. 767, 332 S.W.2d 495 (1960), we reversed a chancellor's decision denying a divorced wife's application for permission to take her three-year-old child to Oklahoma where she and her new husband wished to establish their home. The chancellor's disapproval was based solely on the trailer home's location, as the trailer sat on a hill or ridge some fifty to one hundred yards from the edge of Tenkiller Lake. We wrote:

> If one is inclined to be fearful the threat of danger can be discovered everywhere, in the crowded streets of the city or, as here, in the comparative seclusion of the countryside. We know, however, that in Arkansas and throughout America thousands and thousands of children, representing many generations, have grown up from infancy next to rivers, to lakes, to mountain slopes, and to countless other natural conditions fully as hazardous as those existing near Tenkiller Lake. An attempt to shelter a growing child from every possible danger is manifestly futile, and it is certain that complete security cannot be achieved by means of a court decree. In practice the responsibility for choosing a child's environment must ordinarily rest upon the parent having

custody of the child. The normal love of a parent, especially of a mother, for her child provides the best possible assurance that the infant will not be needlessly exposed to danger. We find in this record no proof to persuade us that the appellant cannot be relied upon to look after her daughter in the new home that she and her husband wish to occupy.

231 Ark. at 770.

■ Other jurisdictions have recognized the inherent flaws in Dr. Jones's argument. We find the case of *Fitzsimmons* v. *Fitzsimmons*, 722 P.2d 671 (N.M.App. 1986), particularly instructive. In that case, the husband, in seeking an original award of custody, argued that, while he remained in the small town of Grants, New Mexico, the wife's new residence in Albuquerque posed a danger to their children. While the trial court was persuaded by the husband's argument, the New Mexico Court of Appeals reversed:

The logic of [husband's] argument is faulty. A person, through no fault of his own, can be a crime victim in any American community. . . To accept husband's argument would require us to find that living in Albuquerque is inherently dangerous, and custody should never be awarded to a parent residing there. To state the proposition is to expose its fallacy.

722 P.2d at 678. *See also King* v. *King*, 500 P.2d 267 (Or. App. 1972)(husband's claim that wife lived in a neighborhood with a high incidence of crime rejected as a change of circumstances justifying a change in custody). Similarly, we are not persuaded that Ms. Jones's move to Little Rock, in and of itself, was a material change in circumstances. To the extent the chancellor relied on this faulty premise in making his decision on the permanent-custody issue, his ruling was in error.

*Dr. Jones's remarriage*

■ Ms. Jones also contests the chancellor's reliance on Dr. Jones's remarriage as a material change in circumstances. While we have previously held that remarriage of one of the parties is a factor that may be considered when deciding what is in a child's best interest, we have applied this principle to modifications of *support* obligations. *Thurston* v. *Pinkstaff*, 292 Ark. 385, 730 S.W.2d 239 (1987); *Reynolds* v. *Reynolds*, 299 Ark. 200, 771 S.W.2d 764 (1989).

Regarding matters of child custody, Professor Atkinson recites the majority view that a change of circumstances of the noncustodial parent, including a claim of an improved life because of a recent marriage, is not sufficient to justify modifying custody. Atkinson, *Modern Child Custody Practice*, § 9.07 at 462-463; !isee also Delgado v. *Silvarrey*, 528 So.2d 1358 (Fla. App. 3 Dist. 1988)(father's remarriage and anticipation of higher standard of living did not amount to circumstances sufficient to support change in custody); *Spoor* v. *Spoor*, 641 N.E.2d 1282 (Ind.App. 3 Dist. 1994)(changes in lifestyle, including remarriage, do not warrant a change in custody). When examining the facts in this case, we cannot agree that Dr. Jones's remarriage constituted a material change in circumstances.

Dr. Jones married his present wife, Diana, five months after the parties' divorce. He admitted at trial that their relationship began in September 1990, predating the parties' November divorce. During oral argument, Dr. Jones agreed that, at the time of the original divorce decree, it was within his reasonable contemplation to remarry.

In *Fullmer* v. *Fullmer*, 761 P.2d 942 (Utah App. 1988), immediately following the parties' divorce, the husband remarried a woman who was pregnant with his child before the divorce was final. While the husband stipulated to the initial custody arrangement that the wife be awarded custody, he petitioned for modification only sixteen months later. In his petition, he claimed that, while the wife's full-time job would cause the child's placement in day care, his new wife was a full-time homemaker. The Utah Court of Appeals rejected his argument, reasoning that the alleged change in circumstances was within the reasonable contemplation of the husband and thus not legally cognizable:

> It is also reasonable to assume that respondent would remarry soon after the parties' divorce and have another child as . . . his second wife was pregnant with respondent's child before the parties' divorce was final. Given respondent's awareness of the circumstances at the time he voluntarily entered into the stipulation which awarded appellant custody, we find his petition to modify custody the very type of litigation and harassment from which our supreme court has attempted to protect custodial parents.

761 P.2d at 947-948.

■ Stated simply, Dr. Jones cannot use the circumstances he created as grounds to modify custody. Given his awareness of the circumstances at the time he voluntarily entered into the agreement to award custody of Cameron to Ms. Jones, we cannot agree that his remarriage constituted a material change in circumstances.

### Cameron's emotional needs

The remaining factor alleged by Dr. Jones was that Ms. Jones had borderline personality disorder with a continuing mental and emotional problem that had caused Cameron to suffer emotional problems. The chancellor found that Ms. Jones's inability to provide for the emotional needs of the child was a material change in circumstances that justified modification of the original custody award.

■ A judicial award of custody should not be modified unless it is shown that there are changed conditions that demonstrate that a modification of the decree is in the best interest of the child, or when there is a showing of facts affecting the best interest of the child that were either not presented to the chancellor or were not known by the chancellor at the time the original custody order was entered. *Stamps* v. *Rawlins*, 297 Ark. 370, 761 S.W.2d 933 (1988). The party seeking modification of the child-custody order has the burden of showing a material change in circumstances. *Carter* v. *Carter*, 19 Ark. App. 242, 719 S.W.2d 704 (1986). While an agreement of the parties regarding custody is not binding on the courts, it is of some importance as tending to show attitude at the time the original divorce suit was filed. *Burnett* v. *Clark*, 208 Ark. 241, 185 S.W.2d 703 (1945).

In this case, at the time the original decree was entered, Dr. Jones agreed that Ms. Jones would have custody of Cameron. The chancellor recognized in his final order that both parties must have considered each other to be fit and proper persons to have custody of the child, and that the custody in Ms. Jones was what both parties felt to be in the best interest of the child at the time. Both parties agreed to communicate and correspond with each other regarding Cameron's health, education, and welfare.

In violation of this agreement, Dr. Jones, giving no notice to Ms. Jones, took Cameron to see Dr. Ternes in April of 1992, then Dr. Harrison in August of 1992. One week after meeting with Dr. Jones and his attorney regarding Dr. Jones plans to change custody,

Dr. Harrison faxed an *ex parte* letter to the chancellor claiming that an emergency existed necessitating that Cameron not be returned to his mother. At the request of Dr. Jones, Dr. Ternes composed a letter containing a similar recommendation and faxed it to Dr. Jones's attorney, who in turn delivered it to the chancellor along with Dr. Jones's verified petition and affidavit. After receiving this information from Dr. Jones and the experts he had employed, the chancellor granted his request for emergency *ex parte* relief.

Professor Atkinson criticizes *ex parte* communication between an expert and the judge as improper. *Atkinson,* Modern Child Custody Practice, § 12.16 at 148 (Supp. 1995). We agree. The letters from Dr. Harrison and Dr. Ternes were not under oath, see Ark. Code Ann. § 16-40-103(b)(Repl. 1994), and should not have been considered by the chancellor.

We are further troubled by the chancellor's second *ex parte* order, which gave Dr. Jones's expert, Dr. Harrison, the authority to modify Ms. Jones's weekday visitation if she found it was detrimental to the child. Professor Atkinson observes that, although a court may base its decision on the opinion of an expert, it cannot delegate to the expert the power to make a decision. *Atkinson,* Modern Child Custody Practice, § 12.15 at 687; *see also Shapiro* v. *Shapiro,* 458 A.2d 1257 (Md. App. 1983). In Arkansas, chancery courts have subject-matter jurisdiction to decide the custody, support, and visitation of a child born of the marriage. *McCormac* v. *McCormac,* 304 Ark. 89, 799 S.W.2d 806 (1990). Not only did the chancellor delegate jurisdiction of the visitation question to Dr. Jones's expert in this case, Dr. Harrison exercised this extraordinary grant of power by way of her *ex parte* letter to the court stating that Ms. Jones's weekday visitation should be terminated. The chancellor entered a third *ex parte* order to this effect on January 4, 1993, thus denying Ms. Jones's weekday visitation. While it is permissible for the chancellor to base an award of custody or visitation after hearing the opinions of experts, we resolve that he cannot delegate this judicial function to someone outside the court, especially to an expert employed by one of the parties.

After receiving a request from Dr. Jones that Dr. Wrenda Gallien be appointed to perform a psychological evaluation, the chancellor entered a fourth *ex parte* order appointing Dr. Gallien's firm, the Family Guidance Center, to *compare parenting abilities* of Dr. Jones, Diana Jones, and Christine Jones. While a comparison of

parenting skills might well be appropriate in determining an initial award of custody, the chancellor's fourth *ex parte* order seems to gloss over the issue before him — whether a material change in circumstances and the best interest of the child necessitated a *change* in custody.

The expert testimony presented at the final hearing on this alleged change in circumstances included the following. Dr. William Siegal treated Ms. Jones in 1987 and diagnosed her as having a borderline personality disorder. Dr. Avram Jeffrey Zolten of the Family Guidance Center examined Ms. Jones and observed that she exhibited paranoid behavior. However, he agreed that he and Ms. Jones encountered difficulties when Ms. Jones wanted to tape record the evaluation. While Dr. Zolten found no evidence that she was incapable of adequate parenting, he expressed concern regarding Ms. Jones's statement that, when she raised her voice to discipline Cameron, he would run to the corner and cry. Dr. Warren Douglas examined Ms. Jones nine times in 1993 and "totally disagreed" with Dr. Siegal's diagnosis that she had a borderline personality disorder. He observed that she was very stable, and had no concerns about her parenting abilities or skills.

Dr. Harrison and Dr. Becky Porter treated Cameron and opined that he had been traumatized by a female authority figure. While neither doctor saw Ms. Jones, both testified that her home presented an unstable environment for the child. Dr. Wrenda Gallien, the court-appointed psychiatrist, testified that Cameron should remain with his mother. She opined that the child would suffer severe trauma if custody were changed because he would be taken from his mother, who had raised him for the two years since the divorce. Dr. Gallien also criticized Dr. Harrison's *ex parte* communication with the chancellor. According to Dr. Gallien, this conduct both constituted and resulted in a "travesty of justice."

Despite the many experts who testified at the final hearing, we note the absence of a disinterested evaluation of the minor child. We think it significant that the chancellor, through its second *ex parte* order, provided that, while Ms. Jones's weekday visitation was subject to review by Dr. Jones's expert, Ms. Jones could not take Cameron to any other psychologists or psychiatrists without court approval.

While the chancellor specifically rejected Dr. Jones's contention that Ms. Jones suffered from borderline personality disorder, he made the following finding in his written order:

> While [Ms. Jones] *has proven* that she is able to function adequately and competently in most areas of her social and work life, the Court *questions* [her] ability to adequately provide an emotional, stable and wholesome home for the child.

(Emphasis added.) The chancellor's finding that Ms. Jones had not *proven* that she was able to provide an emotional and stable home environment for Cameron convinces us that he erroneously shifted the burden of proof to Ms. Jones. The chancellor's repeated entry of *ex parte* orders, his reliance on *ex parte* communications from Dr. Jones's expert, Dr. Harrison, and his failure to appoint a neutral expert to examine the child, lead us to the conclusion that Dr. Jones was somehow relieved of the legal burden to prove that a material change of circumstances and the best interest of the child warranted modification of the initial custody order.

We are mindful of the fact that, as a result of today's decision, Cameron, now age six, will face another change of custody. Yet to uphold the chancellor's shifting of the burden of proof in this case would be to undermine the very purpose of our elevated standard of proof in modification proceedings — to promote stability and continuity in the life of the child. In sum, when viewing together the repeated entry of *ex parte* orders, the erroneous shift of the burden to Christine Jones to prove her emotional stability, and the chancellor's faulty reliance on her move to Little Rock and Dr. Jones's remarriage as material changes in circumstances, we must conclude that the chancellor's decision to change custody to Dr. Jones was clearly erroneous. In so holding, it is unnecessary for us to address Ms. Jones's remaining arguments pertaining to the temporary custody award. *Vairo* v. *Vairo*, 27 Ark. App. 231, 769 S.W.2d 423 (1989).

Reversed and remanded with instructions to reinstate the original custody order.