Rexayne TAYLOR *v.* Scott W. TAYLOR

02-887                                        110 S.W.3d 731

Supreme Court of Arkansas
Opinion delivered May 1, 2003
[Petition for rehearing denied June 5, 2003.*]

---

*Eugene D. Bramblett*, for appellant.

*Ronald L. Griggs*, for appellee.

R OBERT L. BROWN, Justice. This is an appeal from an order of the circuit court granting a change of custody. Appellant Rexayne Taylor asserts that the circuit court erred in transferring custody of her two children, R.T., then age 9, and A.T., then age 5, to the appellee, Scott "Wes" Taylor. She specifically contests the legitimacy of the twin bases for the circuit court's decision to change custody: (1) that Wes Taylor was better able to provide for the children, both financially and educationally; and (2) that an admitted lesbian living with the children and her, even though there was no sex between the two women, was inappropriate behavior. We agree with Rexayne Taylor that the circuit court abused its discretion in awarding sole custody of the two children to Wes Taylor on these grounds, and we reverse the case and remand.

On November 9, 1999, Rexayne Taylor and Wes Taylor were divorced. Under the divorce decree, they agreed to share joint custody of the children, with Rexayne Taylor being the primary custodial parent. Wes Taylor agreed to pay $591 biweekly in child support. Initially, the parents shared a cordial relationship, and the joint-custody arrangement worked well.

In May 2000, a friend of Rexayne Taylor's, Kellie Tabora, who was an admitted lesbian, moved into her home and began paying her $500 a month for living expenses. On May 2, 2001, a little over a year later, Wes Taylor filed a petition to modify the divorce decree. In his petition, he alleged that there had been a change in circumstances warranting a custodial change for the two boys because his former wife's living conditions were not in the best interest of the children. Rexayne Taylor responded and denied the allegations.

On April 10 and 11, 2002, the circuit court held a hearing on Wes Taylor's petition. Wes Taylor's counsel called both Rexayne Taylor and Kellie Tabora to testify at the hearing, and both women acknowledged that Kellie moved into Rexayne's home in

May 2000. Rexayne testified that Kellie slept on the couch most of the time. She added, however, that, on occasion, they would sleep together in Rexayne's bed. Rexayne stated that she was not a lesbian, that she thought homosexuality was wrong, and that she and Kellie did not have a sexual relationship. She further testified that after Wes Taylor filed his petition in May 2001, Kellie slept in a separate bed in a separate room.

In her testimony, Kellie Tabora stated that although she was a lesbian, her last relationship had ended at least three years ago. She testified that she had slept in Rexayne's bed about half the time prior to the filing of Wes Taylor's petition, but that they had had no sexual contact while sleeping in the same bed. Kellie also testified that on three or four occasions, Rexayne's children slept with both women in the same bed. When asked what she would do if the children were teased about her presence in the home, Kellie said she would leave. She further testified that she did not condone a homosexual lifestyle or advocate it.

Wes Taylor presented additional witnesses who testified that he was a good father and that his boys seemed well-adjusted. Each of his witnesses also testified that Rexayne Taylor was a good mother to the boys. Wes Taylor presented testimony from two witnesses that the boys had experienced a change in behavior because of Kellie Tabora's presence: his mother, Barbara Taylor, and his girlfriend, Lynelle Crotty. Mrs. Taylor testified that the difference in the boys' behavior when they are in Kellie's presence and not in her presence is that "they don't come to us when she's present." She further stated that since the divorce, the couple's oldest child, R.T., had experienced a change in personality and was now more withdrawn and cried more often. Lynelle Crotty agreed that R.T. was more withdrawn, while the youngest child, A.T., she believed, became confused when talking about his mother's friend. In addition, Wes Taylor presented several witnesses who testified that they would not allow their children to stay in Rexayne's home, knowing that an admitted lesbian lived there.

Wes Taylor testified that his usual "take-home pay" each week was $1,104 and added that his self-employed business, Taylor Made Systems, was growing and that he now employed seven employees.

He testified that he planned to marry his girlfriend, Lynelle Crotty, and that she and others would assist him in caring for the boys, should he be awarded custody. As to his ability to assist the children with their school work, he stated that he had earned a four-year degree in computer science and that his health was good.

Upon learning of Rexayne Taylor's situation with Kellie Tabora, Wes Taylor expressed his concern about how this would affect the children. He told the circuit court that he believed that R.T. knew what "gay" meant and what a "lesbian" is, and that he did not want to wait until it was "too late" to do something about the situation. He said that in his opinion, he could provide a "more . . . normal home life and social life than Rexayne" could.

In response, Rexayne Taylor presented testimony from both boys' elementary school teachers that they were well-adjusted and enjoyable children. Neither teacher testified to any behavioral change in the boys. In addition, A.T.'s teacher testified that assuming the other children in the school did find out that A.T.'s mother was living with a lesbian, she did not think there would be any repercussions from his peers, although it was possible that they might tease him. Francis Henley, Rexayne's father, testified that he had not observed any changes in the children other than the fact that they were maturing and growing older. He added that he did not believe that Kellie Tabora's presence in their lives was making any difference.

Monica Smith, the mother of R.T.'s best friend, also testified as part of Rexayne Taylor's case. She stated that her boys often spent the night at Rexayne's home and that she was unaware of any unhealthy influences to which they may have been exposed. She also testified that neither R.T. nor A.T. had displayed any change in their behavior or demeanor. Rexayne Taylor took the stand and stated that she brought home $1,000 each month plus benefits from her flower shop, "All About Flowers," and that she was always supportive of her children. She added that if the court was concerned about Kellie and her continued presence in the home she would ask Kellie to move from her home in order to retain custody.

On April 17, 2002, the circuit court filed its letter opinion. In it, the court found that at the time of the divorce, Wes Taylor

made more money than Rexayne Taylor did and was more formally educated.[1] The court further found that Wes Taylor's business had grown and that Rexayne Taylor's flower shop had more or less remained the same. The court concluded that "even though [Wes] was better off financially than [Rexayne] at the time of the divorce it now appears that he is much more financially secure than [Rexayne]." The court stated that it had considered both Wes Taylor's financial ability and education in making the decision to change custody.

The court next considered the "lifestyle and living conditions" of Rexayne Taylor. The court found that both Rexayne and Kellie Tabora had testified that Kellie had lived in Rexayne's home since May 2000, and from May 2000 until May 2001, she and Rexayne had slept in the same bed on numerous occasions. The court observed that both women had denied a sexual relationship and that the sleeping arrangements changed once Wes Taylor filed his petition. The court then made the following observations:

> The plaintiff here claims the circumstances of the expressed sexual preference of Kelli Tabora and the fact that she and defendant slept together for approximately one year requires the conclusion that sex occurs. But if the testimony of defendant and Kelli Tabora is accepted as the truth what is present here is that no actual inappropriate behavior but rather the appearance of inappropriate behavior exists. Is that harmful enough to require removal of these children from that environment? It would seem likely that if it is generally known by friends and acquaintances that defendant resides with and also sleeps with an admitted lesbian, that most will conclude sex is involved. This assumption on the part of the public would subject the children to ridicule and embarrassment and could very well be harmful to them. Therefore, it is the conclusion of this Court that residence of Kelli Tabora with defendant and the children even without sex is inappropriate behavior and is a circumstance that justifies changing of custody from defendant to plaintiff. It is at least poor parental judgment on the part of defendant to allow a well known lesbian to both reside with defendant and the children and sleep in the same bed with defendant.

---

[1] Wes Taylor had four years of college, and Rexayne Taylor had two.

The court declined to award Wes Taylor child support and restricted Rexayne Taylor's visitation rights with the boys to overnight visits when Kellie Tabora was not spending the night with her. On April 18, 2002, an order was entered memorializing the letter opinion.

Rexayne Taylor first claims that at the time Wes Taylor entered into the custody agreement, he was aware of the financial and educational circumstances he now contends constitute a material change in the circumstances of the parties. Thus, she claims, he cannot now use those same grounds as a basis to modify the custody grant. Additionally, Rexayne Taylor maintains that there was no testimony presented that she was not adequately providing for the material and physical needs of the children and that, in fact, the evidence presented demonstrated that she was taking care of the children's educational needs. Finally, she urges that there is no authority for the proposition that a relatively minor difference in educational background between parents, known at the time of the divorce decree, constitutes a material change in circumstances warranting a change of custody.

As to her lifestyle and Kellie Tabora's residence, Rexayne Taylor argues that the circuit court made no finding of actual inappropriate behavior. Instead, the circuit court premised its ruling on the appearance of inappropriate behavior. She submits that the circuit court's conclusions do not rise above mere speculation and conjecture and that the great weight of evidence was that the children had not been the subject of ridicule due to her living arrangement. Her final point is that the circuit court's ruling punishes her and the children, not because she is having an illicit relationship, but because it may appear that way to others, and not because of any demonstrated harm that has come to the children, but because harm may possibly occur in the future.

Wes Taylor responds that the circuit court did not ground its decision on any exclusive rationale, but instead the court considered several factors in reaching its decision. He contends that the danger in the situation, as noted by the witnesses, was that the public might find out about Rexayne Taylor's living situation and the boys would then be subjected to ridicule. He maintains that the circuit court examined all of the circumstances, including factors other than the

cohabitation with a lesbian, and came to the conclusion that there had been material changes since the date of the divorce, including his improved financial condition and his more stable home life. He further emphasizes that Arkansas courts have never condoned a parent's promiscuous conduct or lifestyle in the presence of a child. He concludes that the public is going to believe that Rexayne Taylor and Kellie Tabora were having a sexual relationship, whether they were or not, and that it is that perception which the circuit court found to be dangerous to the children's welfare and which would surely subject them to ridicule.

In *Hamilton v. Barrett*, 337 Ark. 460, 989 S.W.2d 520 (1999), this court set forth its standard of review in change-of-custody cases:

> In reviewing chancery cases, we consider the evidence *de novo*, but will not reverse a chancellor's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Jones v. Jones*, 326 Ark. 481, 931 S.W.2d 767 (1996). We give due deference to the superior position of the chancellor to view and judge the credibility of the witnesses. *Noland v. Noland*, 330 Ark. 660, 956 S.W.2d 173 (1997). This deference to the chancellor is even greater in cases involving child custody, as a heavier burden is placed on the chancellor to utilize to the fullest extent his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Anderson v. Anderson*, 18 Ark. App. 284, 715 S.W.2d 218 (1986). Where the chancellor fails to make findings of fact about a change in circumstances, this court, under its *de novo* review, may nonetheless conclude that there was sufficient evidence from which the chancellor *could* have found a change in circumstances. *Campbell v. Campbell*, 336 Ark. 379, 985 S.W.2d 724 (1999); *Stamps v. Rawlins*, 297 Ark. 370, 761 S.W.2d 933 (1988).

> Our law is well settled that the primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. *Digby v. Digby*, 263 Ark. 813, 567 S.W.2d 290 (1978). A judicial award of custody should not be modified unless it is shown that there are changed conditions that demonstrate that a modification of the decree is in the best interest of the child, or when there is a showing of facts affecting the best interest of the child that were either not presented to the chancellor or were not known by the chancellor

at the time the original custody order was entered. *Jones*, 326 Ark. 481, 931 S.W.2d 767. Generally, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody. *Id.*

337 Ark. at 465-66, 989 S.W.2d at 523 (emphasis in original).

We initially examine whether the trial court erred in basing its transfer of custody in part on the fact that Wes was in a better financial position and had a better educational background than Rexayne. In its order, the circuit court found that at the time of their divorce, Wes Taylor made more money and had more formal education than Rexayne Taylor. The court concluded, however, that although that was the case then, at the present time, Wes Taylor is "much more financially secure than [Rexayne]." The court further found that "it is difficult to ignore the ability of each parent to provide and also to teach and assist with the educational needs of the children."

Professor Jeff Atkinson in his treatise on child custody states that "[f]inancial resources of the parties are normally irrelevant to a custody determination." 1 Jeff Atkinson, *Modern Child Custody Practice* § 4-20, at 4-47 (2d ed. 2002). He adds, though, that "financial resources of the parents have been found to be relevant to the extent that they reflect a parent's ability to provide a stable home." *Id.* As to a parent's ability to meet the child's educational needs, Atkinson says that a significant factor in determining an award of custody is "the ability of one parent to meet the educational or health needs of the child better than the other parent." 1 Jeff Atkinson, *Modern Child Custody Practice* § 4-18, at 4-44 (2d ed. 2002).

In 1982, our court of appeals observed that it was aware of no cases where custody was changed merely because one parent had more resources or income than the other. *See Malone v. Malone*, 4 Ark. App. 366, 631 S.W.2d 318 (1982). A search of our more recent caselaw reveals that this is still the case. In addition, this court has made it abundantly clear that a judicial award of custody should not be modified unless it is shown that there are changed conditions that demonstrate that a modification of the decree is in the best interest of the child, or when there is a showing of facts affecting the best interest of the child that were not known by the

trial court at the time the original custody order was entered. *See Hamilton v. Barrett, supra* (citing *Jones v. Jones*, 326 Ark. 481, 931 S.W.2d 767 (1996)). As to education, our court of appeals has said that "the simple fact that appellee and his family have pursued advanced degrees does not warrant a change in custody." *Vo v. Vo*, 78 Ark. App. 134, 145, 79 S.W.3d 388, 395 (2002).

■ In the case at hand, the record reflects that there have been no such changed conditions, either financially or education-ally, warranting a modification of the Taylors' original custody agreement. Solely because Wes Taylor earns more money than he did when the parties divorced is not a "changed condition" dem-onstrating that a modification of the original agreement is in the best interest of the children. The same holds true for the court's finding as to education. Neither party's formal education has changed since the time of the divorce decree. Furthermore, the bulk of the testimony at the hearing confirmed that the children were doing well in school and were not suffering academically.

■ This court held in *Jones v. Jones*, 326 Ark. 481, 931 S.W.2d 767 (1996), that a father seeking a change in custody could not use circumstances he had created as a ground for modi-fying custody. In that case, one of the alleged changes was the father's remarriage. However, during oral argument, Dr. Jones agreed that at the time of his divorce, "it was within his reasonable contemplation to remarry." 326 Ark. at 490, 931 S.W.2d at 771. We said: "Given his awareness of the circumstances at the time he voluntarily entered into the agreement to award custody of [the child] to [her mother], we cannot agree that his remarriage con-stituted a material change in circumstances." *Id.* at 491, 931 S.W.2d at 772. We hold that Wes Taylor's awareness of both his superior financial situation and the respective parties' educational background at the time he voluntarily entered into the custody agreement, which resulted in the divorce decree, precludes a find-ing that a material change in circumstances has occurred.

We turn then to the circuit court's finding concerning Rex-ayne Taylor's living arrangement with an acknowledged lesbian. It is clear to this court that the circuit court was concerned about the boys' best interest. Yet, the court grounded its decision on the

"appearance of inappropriate behavior" while, at the same time, crediting the two women's testimony that they did not have a sexual relationship. Based upon appearances, the circuit court concluded that the public's assumptions "would subject the children to ridicule and embarrassment and could very well be harmful to them." No finding was made that the children had in fact been harmed or affected by their mother's action of sleeping in the same bed with Kellie Tabora prior to the filing of the modification petition on May 2, 2001. To the contrary, the weight of the testimony, including that of each child's schoolteacher, was that the children were happy, well-adjusted, outgoing, and well-parented children.

It is true that this court has held that a parent's unmarried cohabitation with a romantic partner, or a parent's promiscuous conduct or lifestyle, in the presence of a child cannot be abided. See Taylor v. Taylor, 345 Ark. 300, 47 S.W.3d 222 (2001); Campbell v. Campbell, 336 Ark. 379, 985 S.W.2d 724 (1999); Walker v. Walker, 262 Ark. 648, 559 S.W.2d 716 (1978). The instant case, however, is altogether different. Here, it appears from the circuit court's statements that the court was trying to protect the children from future harm based on future public misperception. A review of our caselaw reveals that this court has yet to address a situation in which a parent's current actions might bring about a future harm for a child based on the public's erroneous perception. We turn to other jurisdictions for guidance on this point.

In Rowsey v. Rowsey, 174 W. Va. 692, 329 S.E.2d 57 (1985), the custodial mother had associated with a lesbian but denied a sexual relationship. The father petitioned for a change of custody because of potential harm to the children. The circuit court granted the petition. The Supreme Court of Appeals of West Virginia reversed and held that a change of custody "based on a speculative notion of potential harm is an impermissible exercise of discretion." Rowsey, 174 W. Va. at 695, 329 S.E.2d at 61. The court reiterated its fundamental principle that a change of custody shall not be ordered unless it is shown that "such change would materially promote the welfare of the children." Id. at 696, 329 S.E.2d at 61. The court held that "[t]he fact that a custodial parent and her children are in the presence of a woman who is

reputed to be a lesbian is not a ground for changing custody to the noncustodial parent." *Id.* at 695, 329 S.E.2d at 60.

Similarly, in *Fox v. Fox*, 904 P.2d 66 (Okla. 1995), the Supreme Court of Oklahoma examined the impact of the custodial mother's lesbianism on the children. The Supreme Court reversed the trial court's order, which had found that the mother to be unfit and changed custody to the father. The court emphasized that the evidence showed that the children were emotionally tied to both parents, that the mother had a loving and nurturing relationship with the children, that the father genuinely cared for the children and desired to be involved in their upbringing, and that the children were progressing satisfactorily, both socially and academically, and were well-adjusted and happy. The Oklahoma Supreme Court held that there had been no proof that the mother's lesbianism had had any adverse effect on the children. Thus, the father had failed to meet his burden of proof for a change of custody.

The Nebraska Court of Appeals held to the same effect in *Hassenstab v. Hassenstab*, 6 Neb. App. 13, 570 N.W.2d 368 (1997). There, the appellate court affirmed a trial court and held that where there was no showing that the child was directly exposed to her mother's sexual activity with another woman living in the home or that the child was harmed in any way by the mother's homosexual relationship, a material change in circumstances had not been shown which warranted a change in custody. *See also Van Driel v. Van Driel*, 525 N.W.2d 37 (S.D. 1994).

The Illinois Appellate Court, Third District, has maintained a similar stance. *See In re: Marriage of R.S.*, 286 Ill. App. 3d 1046, 677 N.E.2d 1297 (1996). In that case, the court examined whether a trial court erred in modifying custody based on the custodial mother's open homosexual relationship with another woman living in the home and "the possibility that the children could experience social condemnation as a result of the relationship." 286 Ill. App. 3d at 1048, 677 N.E.2d at 1298. The mother testified that the children had never seen the two women engaged in sexual relations. The appellate court reversed the trial court's order modifying custody and specifically held that "the potential for social condemnation,

standing alone, cannot justify a change in custody." *Id.*, 677 N.E.2d at 1298. In its analysis, the court emphasized the fact that the trial court made no finding that the children were being adversely affected by their mother's homosexual relationship. *See id.* The court further underscored testimony from the court-appointed psychologist that any risk of condemnation by the children's peers would not be eliminated by awarding custody to the children's father. *See id.* The court concluded that "[w]hile the father argues that a court should not wait until actual harm has occurred before modifying a prior custody order, . . . courts may modify custody only if the petitioning parent presents clear and convincing evidence to support his claim that the custodial parent's conduct endangers the moral well-being of the children." *Id.* at 1055, 677 N.E.2d at 1303. This the father had not done.

There is contrary authority in Missouri where the appellate court held that if damage is likely to occur as a result of a custodial parent's homosexual relationship, the court was justified in modifying custody by restricting the father's visitation. *See J.P. v. P.W.*, 772 S.W.2d 786 (Mo. Ct. App. 1989). In *J.P. v. P.W.*, the appellate court held that where "unrestricted visitation by the [homosexual] father would endanger the child's mental health and emotional development[,]" the case would be remanded to further modify custody to provide for periodic supervised visitation. *Id.* at 794. In that case, overt affection between the father and his same-sex partner was occurring in front of the child.

We note that in the case before us, there is no proof of a sexual relationship between Rexayne Taylor and Kellie Tabora. In fact, both women denied that any sexual contact had occurred in the past or was presently occurring. Moreover, the circuit court did not base its decision on the fact that the women were engaged in a sexual relationship. Wes Taylor correctly points out that this court has held that a trial court did not err in determining it was not in the children's best interest for their primary custodian who was involved in a homosexual relationship to "continue cohabitating with another adult with whom she admitted being romantically involved." *Taylor v. Taylor*, 345 Ark. at 305, 47 S.W.3d at 225. But we contrast those circumstances with the instant case, where the

circuit court credited Rexayne Taylor's and Kellie Tabora's testimony that they were not romantically or sexually involved.

Furthermore, Wes Taylor has failed to demonstrate any actual harm or adverse effect to the boys attributable to Kellie Tabora's presence in the household. Because no harm has been shown to the children, because there was no showing that the two women are engaged in a lesbian relationship, and because Kellie Tabora is no longer sleeping in Rexayne Taylor's bed, we disagree that a change of custody premised on appearances and on the potential for teasing in the future is sufficient to constitute a material change in circumstances. Clearly, it was in the best interest of the boys to stay in an environment in which, by all accounts, they were thriving.

We further disagree that a decision can be based on perceptions and appearances rather than concrete proof of likely harm. In this regard, we are persuaded by the reasoning of the Maryland Court of Appeals in a case involving visitation with a parent involved in a homosexual relationship:

> ... If there is sound evidence demonstrating that a child is likely to be harmed down the road, but there is no present concrete finding of harm, a court may still consider a child's future best interests and restrict visitation. The need for a factual finding of harm to the child requires that the court focus on evidence-based factors and not on stereotypical presumptions of future harm.
>
> Therefore, before a trial court restricts the non-custodial parent's visitation, it must make specific factual findings based on sound evidence in the record. If the trial court does not make these factual findings, instead basing its ruling on personal bias or stereotypical beliefs, then such findings may be clearly erroneous and the order may be reversed. In addition, if a trial court relies on abstract presumptions, rather than sound principles of law, an abuse of discretion may be found.

*Boswell v. Boswell*, 352 Md. 204, 237, 721 A.2d 662, 678 (1998).

While we are well aware of the expression that "perception is reality," when dealing with the extreme seriousness of changing the custody of children from one parent to the other, we are convinced that evidence-based factors must govern. Here, there is not only the absence of proof that a homosexual relation-

ship was occurring, but the great weight of evidence supported Rexayne Taylor's position that the boys were well-adjusted and happy in their environment and had not been adversely affected by her living arrangement. We, therefore, hold that the circuit court abused its discretion in changing the custody of R.T. and A.T. from Rexayne Taylor to Wes Taylor. Accordingly, we reverse the order of the circuit court and remand.

Reversed and remanded.