Lisa L. HOLMES *v.* Joseph Daniel HOLMES

CA 06-110                                                255 S.W.3d 482

Court of Appeals of Arkansas
Opinion delivered April 11, 2007

*Robert L. Depper, Jr.*, for appellant.

*Ronald L. Griggs*, for appellee.

WENDELL L. GRIFFEN, Judge. In an order entered July 1, 2005, the Union County Circuit Court changed the custody of the parties' minor son from appellant Lisa Holmes to appellee Joseph Holmes. Appellant challenges the sufficiency of the

evidence to support the decision. She specifically argues that her sexual orientation should have had no bearing on the circuit court's decision. We affirm, holding that the circuit court's decision to order a change of custody was not clearly erroneous based on the facts presented in the record.

### Background Facts

The parties were divorced by decree of the Union County Circuit Court on January 25, 2001. Custody of their son Zachary (born May 26, 1998) was granted to appellant. On July 1, 2001, both parties filed petitions relating to custody of Zachary. Appellant stated her intent to marry and petitioned the court for permission to move to Mississippi. Appellee requested custody of the child, alleging a change of circumstances due to his recent remarriage and alleging that appellant was not properly caring for Zachary. At the hearing, appellant admitted to cohabiting with her fiancé, but argued that the cohabitation was unimportant because appellee had cohabited with his wife prior to their marriage. The court allowed appellant to retain custody of Zachary provided that she cease to cohabit with her fiancé without the benefit of marriage by December 2001.[1] An agreed order was filed on July 31, 2002, enjoining the parties from having overnight guests of the opposite sex during their custody and custodial visitation. Another order was filed on February 7, 2003, ordering the parties "to set aside their ill-will for each other for the benefit of the minor child and to be flexible with visitation." On February 3, 2004, appellee again petitioned the court for custody of Zachary, citing "lifestyle of the [appellant]" as the change in circumstances. A circuit court held a hearing on the petition on June 10, 2005.

According to the record from the June 10 hearing, appellant cohabited with Jerod Null in Vicksburg, Mississippi, from June 2001 to January 2002. Afterward, she moved in with her grand-

---

[1] The circuit court noted in its order:

Cohabitation without marriage does not appear very important to either plaintiff or defendant. [Appellant] cohabitates [sic] with her fiancé and the [appellee] did so prior to his marriage in May. Also, the [appellee] testified that cohabitation is not as important to him as the lack of family in Mississippi. Cohabitation, however, is not a practice which is to be condoned by this Court when considering appropriate child rearing circumstances.

mother and stayed there until November 2002, when she began living with Steve Sullivan. Appellant and Sullivan were married at some point, but appellant divorced him because of domestic violence. Appellant then began a sexual relationship with Patty Walden, and the two lived together on David Street in El Dorado from January 2003 to June 2003. She then moved to Moro Bay Highway with her first cousin and current romantic partner, Kimberly Duncan, and Duncan's daughter. The four (appellant, Zachary, Duncan, and Duncan's daughter) moved into their current residence on Retirement Lane in Lawson, Arkansas, in October 2003. Meanwhile, appellee remarried after divorcing appellant. He and his wife Leslie have a child together, and Leslie has two children from a previous marriage.

The record also shows that Zachary, who was seven years old at the time of the hearing, recently completed the first grade and received mostly A's. He scored either average or above average in all categories on a recent standardized test. Zachary participates in Awana, a Christian organization where children learn Bible verses and receive rewards. He does not participate in organized sports despite appellee's efforts to get him involved. At the hearing, child psychologist Carol Garrett testified that she saw Zachary following a recommendation that he be evaluated for emotional and developmental problems. She opined that Zachary was well adjusted. While she noted a slight amount of hyperactivity, she made no such diagnosis because he was making good grades in school. Dr. Garrett testified that a tornado had destroyed Zachary's home and that he adjusted well to the loss of most of his possessions. She reported that Zachary had accepted appellant's romantic relationship with Duncan. She did not see a need for counseling relating to Zachary's emotional situation. On cross-examination, Dr. Garrett was asked what would happen if other children taunted him about appellant's sexual orientation. She replied that the impact could be negative; however, she stated that Zachary could handle such taunting without a problem and cited his ability to handle his parents' divorce, the tornado, and appellant's relationships.

Zachary weighed forty-three pounds, which was in the fifth percentile of children his age. Appellant was unconcerned about Zachary's weight; appellee believed that Zachary was underweight. The court heard testimony regarding Zachary's health

from Dr. Gary Bevil.[2] The previous December, Dr. Bevil diagnosed Zachary with an upper respiratory infection, allergic rhinitis, a sinus infection, and an ear infection. Dr. Bevil also saw Zachary for diarrhea in June 2002 and for constipation in November 2002 and March 2004. However, he was not alarmed by Zachary's health. Regarding Zachary's growth rate, Dr. Bevil opined that Zachary had grown appropriately. He noted that Zachary only weighed five pounds, eleven ounces at birth; however, Zachary's growth had followed the standard growth chart.

At the hearing, appellant admitted that she has had six sexual partners — three men and three women — since the parties divorced and that Zachary was exposed to all six of them. She stated that the relationship with Duncan began while she was living with Walden. Appellant testified that Duncan was visiting from Wisconsin and later moved in with Walden and her. Appellant and Duncan became attracted to each other and moved into a residence on Moro Bay Highway. Appellant admitted that she kisses Duncan goodbye when one of them leaves and that Zachary is sometimes present. She also acknowledged that she does not attend church, and she testified that she did not believe everything said at church and did not care for hypocrites in the church. She noted that she last took Zachary to church for Easter. Prior to that, it was four years since she last took him to church. She took Zachary to church for Easter because he had asked to go.

Regarding her finances, appellant testified that she receives $129 per month in food stamps and that Duncan receives $226 per month. She stated that she was working as a substitute teacher at South Arkansas Community College, where she is paid $20 an hour, and at Union School, where she is paid $50 a day; however, she could not estimate her monthly income, and she could not anticipate when she would be called to teach. She stated that Duncan makes $240 per week gross. Appellant testified that the job as a substitute teacher allows Duncan and her to pay the bills.

Appellant described Zachary as a very bright, intelligent, caring, and sensitive child. She stated that Zachary was afraid of getting hurt but was not a whiner. She testified that she raises Zachary in a loving environment and was not concerned about the

---

[2] During his testimony, appellee stated that he does not take Zachary to Dr. Bevil, noting that Zachary had seen Dr. Bevil sixteen times over a two-year period and that Dr. Bevil had not helped Zachary.

effect her sexual orientation had on him. Appellant stated that she first noted that she was interested in homosexual relationships when she was thirteen and that she disclosed her interest in lesbian relationships to appellee before they were engaged. She testified that the issue also arose in April 2000 because appellee wanted her to be with him and another woman at the same time.

Lori and Chuck Thaxton both testified that they saw appellant at a local club with Duncan and Sullivan the previous Saturday night and that she was still there at 2:00 a.m. Chuck also testified about an incident between appellant and Leslie (appellee's spouse) on June 13, 2004. On that day, Chuck was inside a convenience store when she saw appellant and Leslie arguing about a custody exchange. Appellant was swearing during the argument. Zachary saw and heard the argument.

Elichia Taylor testified that she is in appellee's home every week and knows his family well. She stated that nothing in the home gave her pause as far as the care, nurturing, and upbringing of a child. Taylor stated that Zachary is happy when he is with appellee; however, he is also "standoffish." She was concerned that Zachary was whiney and did not like to be rambunctious. On cross-examination, she said that she was displeased with how appellant acts with Zachary. She noted one occasion when Leslie called her early in the morning and reported that appellee had taken Zachary to the hospital. When Taylor arrived at appellee's home, Leslie called appellant to let her know that Zachary was sick. During the conversation, appellant and Leslie were arguing and cursing.

Duncan acknowledged that she and appellant are in a homosexual relationship. She did not believe there was anything emotionally or physically wrong with Zachary and denied that Zachary was troubled by the relationship between her and appellant. She also denied that Sullivan was part of the family unit. She testified that appellant left Sullivan because of violence; however, the violence disappeared after appellant and Sullivan separated. Duncan testified that she was in love with appellant and had no reason to leave her, but that nothing would prevent her from leaving appellant if she wanted to do so.

Melissa Parnell, appellee's cousin, testified that Zachary did not like to communicate, did not like to hug, and often looked depressed. She stated that Zachary would be very happy when he

went to church on Wednesday nights. She was also present for the altercation between Leslie and appellant outside the convenience store.

Brenda Holmes, appellee's mother, testified that appellee was very thorough in tending to his children and stepchildren. She stated that Leslie was a stay-at-home mom and kept the home very clean. She was concerned about Zachary's health while living with appellant. Specifically, Brenda stated that Zachary had a bad cough, had several allergic reactions, and looked too thin. Holmes testified that she was a registered nurse, and that as a nurse, she disagreed with Dr. Bevil's assessment of Zachary's health.

Leslie described her relationship with appellant as "wishy washy" and opined that one never knows what appellant is thinking. She admitted that she and appellant have had confrontations and testified about one incident where appellant called from Hot Springs at 6:00 p.m. and stated that she would be about three hours late. Appellant arrived at a local gas station at midnight and called Leslie. When Leslie arrived at the gas station, appellant started swearing at her and was mad because she thought Leslie had not informed appellee. During the incident when appellee had to take Zachary to the hospital, appellant yelled at Leslie for not calling before taking Zachary to the hospital. Leslie testified that she did not agree with appellant's lifestyle and opined that Zachary should be raised in a heterosexual, Christian home. She also believed church to be an important part of her family's life. However, she stated that she was also concerned about Zachary's medical needs and appellant's instability.

Appellee testified that he works as a pipe fitter and brings home $511.61 per week. He believed that Zachary living with appellant was detrimental to Zachary's mental health and well being. He did not approve of appellant's lifestyle and believed that he had a right to raise Zachary in a heterosexual environment. He also did not want Zachary to grow up in a home that did not approve of church. Appellee described Zachary as a "pretty good kid," but he was concerned about how much Zachary cried and about his lack of desire to play sports. He was also worried about other children taunting Zachary because appellant is homosexual. He acknowledged that, like appellant, Leslie did not have a job; however, he testified that he made enough money to support the family.

Mindy King, a friend of appellant's, testified that she visits appellant almost every day after work and that appellant's home is

well maintained. King stated that she never saw Zachary cry or exhibit any emotional difficulty. She described Zachary as more emotionally stable than her children.

Debra Newkirk testified that appellant babysat her children after she and appellant became friends. She noted that appellant would constantly watch and care for Zachary. She had no concerns about appellant's parenting skills. Newkirk opined that appellant's homosexuality had no impact on Zachary.

In a letter opinion dated June 30, 2005, the circuit court awarded appellee custody of Zachary, stating:

> The primary consideration in a child custody case is the welfare and best interests of the child involved. It is obvious that [appellant] has purposefully chosen to ignore what appears to be a clear caveat by the Court regarding cohabitation outside of marriage. A non-cohabitation order is not imposed merely to monitor a parent's sexual conduct, but is instead intended to promote a stable environment for the children. Arkansas' appellate courts have steadfastly upheld lower courts' orders that prohibit parents from allowing romantic partners to stay or reside in the home when the children are present. These courts have never condoned a parent's promiscuous conduct or lifestyle when such lifestyle has been in the presence of a child. Trial courts continue to hold that cohabitation without the benefit of marriage is an important factor in considering what is in the best interest of the child and extra-marital cohabitation has never been condoned, as it is contrary to the public policy of promoting a stable environment for children.

> The Court realizes that in the past [appellant] may have been the primary caretaker for this child, however, this fact can not be determinative in this case. The overall welfare and best interest of the child must be the primary consideration in determining custody.

> [Appellant's] lack of residential, employment, financial and moral stability manifests an overall lack of stability in Zachary's life warranting a change of custody. Appellee] has met his burden of proof that there has been a substantial change in the circumstances of the parties since the date of the previous custody order and that it would be in the best interest of this minor child that he be in the custody of the [appellee].

(Citations omitted.) The letter was incorporated into an order entered the following day.

*Analysis*

Appellant argues that the circuit court erred in awarding appellee custody of Zachary. She contends that her sexual orientation is irrelevant when making a custody determination and that changing custody due to sexual orientation violated equal-protection guarantees and her civil rights. She also emphasizes that she is a loving mother, that Zachary is emotionally well developed and physically healthy, and that she and Duncan successfully manage their finances. Appellant argues that the evidence that Zachary whines and does not like to play sports is of no consequence.

Cases involving child custody and related matters are reviewed de novo, but we will not reverse the circuit court's ruling unless it is clearly erroneous. *Bernal v. Shirley*, 96 Ark. App. 148, 239 S.W.3d 11 (2006). A finding of fact is clearly erroneous when the reviewing court is left with a definite and firm conviction that a mistake has been committed. *Id.* In reviewing the lower court's findings, due deference is given to the circuit judge's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony. *Hunt v. Hunt*, 341 Ark. 173, 15 S.W.3d 334 (2000). Our deference to the circuit court is greater in custody determinations, as a circuit court charged with deciding a question of child custody must utilize to the fullest extent all of its powers of perception in evaluating the witnesses, their testimony, and the child's best interest. *Word v. Remick*, 75 Ark. App. 390, 58 S.W.3d 422 (2001).

Arkansas law is well settled that the primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. *Alphin v. Alphin*, 364 Ark. 332, 219 S.W.3d 160 (2005). A judicial award of custody should not be modified unless it is shown that there are changed conditions that demonstrate that a modification of the decree is in the best interest of the child, or when there is a showing of facts affecting the best interest of the child that were either not presented to the chancellor or not known by the chancellor at the time the original custody order was entered. *Campbell v. Campbell*, 336 Ark. 379, 985 S.W.2d 724 (1999); *Vo v. Vo*, 78 Ark. App. 134, 79 S.W.3d 388 (2002). The party seeking modification has the burden of showing a material change in circumstances. *Campbell, supra.* While custody is always modifiable, in order to promote stability and continuity for the children and to discourage repeated

litigation of the same issues, our courts require a more rigid standard for custody modification than for initial custody determinations. *Vo, supra.*

■ We hold that the circuit court's decision to award appellee custody of appellee is not clearly erroneous. While the parties attempt to make appellant's sexual orientation a major issue, the circuit court's decision does not turn on her sexual orientation at all. This case is factually distinguishable from *Taylor v. Taylor,* 353 Ark. 69, 110 S.W.3d 731 (2003), where the Arkansas Supreme Court reversed a custody modification based, in part, on the supposition that the mother's homosexuality would adversely affect an otherwise happy and well-adjusted child. By contrast, the instant record shows that appellant had six different sexual partners in a four-and-a-half year period. In every instance, appellant cohabited with her partner in the presence of Zachary despite an explicit court order that forbade extramarital cohabitation in front of the child. While appellant acknowledges that Arkansas courts do not condone extramarital cohabitation, *see Hamilton v. Barrett,* 337 Ark. 460, 989 S.W.2d 520 (1999); *Alphin, supra; Word, supra;* and presume that illicit sexual conduct on the part of the custodial parent is detrimental to the children, *see Digby v. Digby,* 263 Ark. 813, 567 S.W.2d 290 (1978); *Thigpen v. Carpenter,* 21 Ark. App. 194, 730 S.W.3d 510 (1987), she urges us to reverse because she has provided a stable environment for the children and because homosexuals cannot marry in Arkansas. Reversal based on this argument, however, would require that we disregard these policies and the circuit court's finding that exposure to appellant's sexual partners was detrimental to Zachary's welfare.

The record is also replete with evidence of appellant's lack of financial, residential, and employment stability. Appellant has had multiple residences. She is currently dependent upon Duncan, who has no legal or moral obligation to care for Zachary. This evidences little effort by appellant to maintain a stable life for her son. The record also demonstrates appellant's inability to get along with Leslie and appellee despite being ordered to set aside her ill-will toward them for the sake of the child. Due to appellant's lack of stability, a change of custody was clearly warranted.

Affirmed.

HART and BAKER, JJ., agree.