2012 Ark. App. 385

**Anthony SISSON, Appellant**

v.

**Angela SISSON, Appellee.**

**No. CA 12–53.**

Court of Appeals of Arkansas.

June 13, 2012.

Paul A. Schmidt, Jr., Schmidt Law Firm, PLC, Cabot, for Appellant.

Janie M. Evins, Hot Springs, for appellee.

RITA W. GRUBER, Judge.

Anthony and Angela Sisson, now appellant and appellee, were divorced in April 2008 by order of the Circuit Court of Garland County. The circuit court approved and incorporated into the divorce decree an agreement between the parties giving custody of their three children to appellee and visitation to appellant. This appeal arises from the circuit court's dismissals of an April 2011 petition by appellant that custody should be changed to him

and his September 2011 motion for emergency relief. He contends that the court erred (1) in dismissing his petition for change of custody and his subsequent motion for emergency relief, and (2) in excluding from evidence copies of criminal documents concerning appellee's boyfriend Chris Root. We agree with appellant's arguments concerning the dismissal of his petition to change custody, and we reverse and remand.

The primary consideration in child-custody cases is the welfare and best interest of the children. *Calhoun v. Calhoun*, 84 Ark.App. 158, 138 S.W.3d 689 (2003). Custody is not altered absent a material change in circumstances, and the party seeking modification of the child-custody order has the burden of showing a material change in circumstances. *Id.* In deciding a petition for change of custody, the trial court must first determine whether there has been a significant change in the circumstances of the parties since the most recent custody decree. *Schwarz v. Moody*, 55 Ark.App. 6, 928 S.W.2d 800 (1996).

In a nonjury trial, a party may challenge the sufficiency of the evidence at the conclusion of the opponent's evidence by moving to dismiss. Ark. R. Civ. P. 50(a) (2011). When a party moves for a "directed verdict" or dismissal in a nonjury trial, it is the duty of the trial court to consider whether the claimant's evidence, given its strongest probative force, presents a prima facie case. *Stephens v. Miller*, 91 Ark.App. 253, 209 S.W.3d 452 (2005). It is not proper when the plaintiff completes his case for the court to exercise its fact-finding powers such as judging the witnesses' credibility, and the motion should be denied if it is necessary to consider the weight of the testimony before determining whether the motion should be

granted. *Wagner v. Wagner*, 2011 Ark. App. 475, 2011 WL 2557619; *Stephens, supra.*

When reviewing the grant of a motion to dismiss, we view the evidence in the light most favorable to the nonmoving party, giving the proof presented its highest probative value and taking into account all reasonable inferences deducible therefrom. *Hobby v. Walker*, 2011 Ark. App. 494, 385 S.W.3d 331; *Wagner, supra.* We will affirm if there would be no substantial evidence to support a jury verdict; if the evidence is such that fair-minded persons might reach different conclusions, a jury question exists and the directed verdict will be reversed. *Wagner, supra.*

*Appellant's Petition to Change Custody*

Appellant alleged in his April 2011 petition to change custody that a significant change of circumstance existed in that appellee had been "unstable" since the time of the divorce. He alleged that she moved several times, changing her teaching jobs and twice changing the children's school district; exposed the children to multiple boyfriends and was married briefly in 2010; continued to expose the children to boyfriends, in and out of the home; had a history of drinking heavily since the divorce; and allowed the children to be aware of her patterns of behavior. Appellant asserted that the children—ages eleven, nine, and five at the time of the petition—were not thriving in their environment.

Three days before the change-of-custody hearing, scheduled for July 15, 2011, appellee filed a motion in limine to quash certain exhibits and the testimony of two witnesses. She asserted that the exhibits had not been timely produced in discovery and that the two potential witnesses had not been named in appellant's witness list. The circuit court denied appellee's motion

but ruled that she could renew her objections during the course of the hearing.

At the change-of-custody hearing, appellant presented his own testimony and that of Chris Root; Chris's wife, Miranda Root; appellee's estranged husband; and appellant's wife, Lauren Lee Sisson. Also introduced into evidence were printouts from appellee's Facebook pages and an undated letter of apology from Mr. Root to his wife.

Appellant testified that appellee moved three times in a year; changed jobs and the children's school; allowed the family home to go back to the bank; and in the sixth week of her marriage following the divorce from appellant, told him that her new husband was controlling, that he had an alcohol problem and smoked marijuana, and that she and the children moved to a duplex after he had kicked them out. Appellant stated that on the past New Year's, and subsequent to appellee's brief remarriage, a man in a four-week relationship with her was introduced to the parties' oldest child, daughter M. Appellant told the court that he was concerned about appellee's stability and pattern of poor decisions, such as allowing the children to be exposed to multiple men.

Appellant testified that appellee's growing pattern of poor decisions included exposing the children to a man with police records and that appellee had introduced the children to Chris Root, who was her current boyfriend and a married man. Appellant told the court that appellant was "afraid of what's going to happen with the children." He said that he had expressed concerns to appellee and had shown her a police report and paperwork of criminal filings against Mr. Root concerning violence toward children and women. He testified that he had expressed his concerns about both appellee's and the chil-

dren's safety more than once, but appellee dismissed his concerns.

Appellant stated that he had been monitoring appellee through M.'s Facebook page for a long time. He said that some documents abou. which he testified were from February through September 2008 and that in a set of Facebook postings from March and April 2011, appellee discussed online her relationship with Mr. Root. Appellant stated that his specific concerns were that Mr. Root drank too much, was still married, and had been violent with women and children—as shown by accusations of threats and rape, shooting at the tires of a young man on a bicycle, and putting his hands around his stepdaughter's neck.

Finally, appellant testified that his children had said nothing to cause him concern about their relationship with Mr. Root or with their former stepfather. He testified that he could provide a more stable environment for the children, with more consistency and routine, and that he told the children he had filed for custody. He testified that it was his job as a parent to maintain his children's safety, sometimes making difficult decisions they did not like.

During appellant's testimony, the circuit court sustained appellee's objection that two documents should not be admitted into evidence. The proffered documents were certified copies of petitions for orders of protection against Mr. Root by different women, each alleging domestic abuse and requesting protection for the petitioner and her children. An October 2010 petition by Erica Harris, who was in a dating relationship with Mr. Root at the time and had formerly resided with him, alleged recent acts of physical abuse and stated that she had filed a police report for harassment, assault, and intimidation. His alleged acts, sometimes in the presence of Ms. Harris's children, included breaking down a door at midnight, drunk; threatening her children and family; slamming her head into a windshield and bruising her arms and head; slamming her against a wall and choking her; and threatening to use his gun to kill her should she ever leave him. The second proffered petition for protection was filed in April 2010 by Mr. Root's then wife, Leslie Miranda Root. Attached to the petition was her statement by affidavit that her twelve-year-old daughter said Mr. Root had put his hand around her neck; that when Ms. Root confronted him, he threatened her with physical harm; that for an hour and a half, he violently and repeatedly raped her; and that he talked about killing her in a slow, brutal murder with an audience present.

Ms. Root testified at the July 2011 hearing that she had been subpoenaed to appear and did not come voluntarily. She stated that she and Mr. Root had separated a year earlier, were still married, were going through a divorce and fight for custody of their eight-year-old son, and were to appear the following Friday in the same court where she was currently testifying. She stated that she had two daughters from a former marriage, ages nine and twelve, and that Mr. Root had been violent to the children—he would "slap them in the head, holler and cuss them," and within in the last year, he had choked the older daughter. Ms. Root testified that when she asked her husband about the incident, he got mad and then raped her. She said that he also had hit and choked her in the past—probably at least once a month the whole nine years they were together. She said that she had filed charges and filed for an order of protection but that she dropped the charges because he threatened her and family members. She said that she was afraid of him and was concerned about his being around children,

explaining that he drank "all the time," was abusive and easily enraged, and combined drinking and driving. She said that she was familiar with his ex-girlfriend Erica Harris and had concerns that he would hurt any woman with whom he had a relationship, doing "the exact thing" he had done to her (Ms. Root).

Chris Root testified as an adverse witness. He admitted that more than one person "may have" filed charges against him for violence but stated that he had been convicted only of public intoxication four or five years ago. He denied pulling a gun and pointing it at a young man on a bicycle, explaining that he (Mr. Root) had simply shot a firework in his yard. He denied hitting or choking his wife, raping her, or choking her daughter. He acknowledged that Ms. Harris had filed harassment and terroristic-threatening charges against him, but he denied her allegations and denied hurting her. In an undated letter introduced into evidence during his testimony, Mr. Root referred to past incidents and apologized to his wife for "this time," which he did not identify. He asked for forgiveness and begged her not to take away his freedom, writing that he wanted to be best friends and "raise the children together, not from Prison, which is where this is headed unless you undo it. . . . [I]f this goes bad I'm afraid my life will be over!" During his testimony, Mr. Root said that he had written the letter after a week-long argument with his wife, not a rape. He again denied raping her.

Mr. Root testified that he and appellee broke up a couple of months before the July hearing and were no longer together. He said that they had been together with her children in March, April, and May but that by June he was no longer coming to the home and having meals with them. He explained that once, previously, he had slept overnight on the couch after the youngest son accidentally locked his keys in his truck and that he had sneaked into the home other mornings after 6:00 a.m. to make breakfast for appellee. He denied drinking in front of the children, but he also said that he could not say that he had not done so.

Charlie Knox testified that he and appellee married in July 2010 but divorced in September 2010 because they just could not get along. He testified that he did not smoke marijuana but occasionally drank too much before the divorce. Lauren Sisson, appellant's wife, testified that they had been married for three years and that appellant had adopted her son, who would soon be eight. She said that she had watched appellant struggle with appellee's decision-making in the last few years.

Appellee moved for a "directed verdict" at the conclusion of appellant's evidence, asking that his petition to change custody be dismissed because he failed to prove any direct harm to the children and to prove anything allegedly detrimental to their care impacting their health or well-being. Appellant responded that there was ample testimony of "harmful activity" within the home and violation of court orders "that can't help but affect these minor children," and that appellee's Facebook page exhibited "bad judgment and over sharing . . . of information with the children."

The court ruled from the bench that appellant had not met his burden of showing a material change of circumstances justifying a change of custody. The court stated, "I think he has fears that may prove to be well grounded in the future. But right now, . . . the evidence is primarily speculative" and reflective of a divorced parent's concerns "as to what activity of their ex-spouse may result in some problems." On this basis, the court concluded that appellant had not met his burden of

proof to the degree warranting a change of custody. In response to appellant's asking whether the court was finding no change of circumstances and no instability, the court clarified:

Well, I'm not saying there has been no change of circumstance. I'm saying there's not been proof of a material change of circumstance that rises to the level that justifies the court changing custody. Of course there have been some changes. But I'm not finding that they have risen to the level to require changing—that the court review a change of custody.

The docket entry reflects that appellee's motion for directed verdict and dismissal was granted on the grounds of "no showing of any detriment to the children and no showing of material change of circumstance."

### Emergency Ex Parte Proceeding for Expedited Relief and Motion for Contempt

Before the court entered its written order from the first hearing, appellant filed an emergency action pointing to evidence that the children were still being exposed to Mr. Root, that he was drinking on a frequent basis, and that M. was afraid of him. Some of appellant's allegations concerned a camping trip in August 2011, in which appellee, the parties' children, Mr. Root, and various other family and friends had spent the night. In an emergency order of September 9, 2011, the circuit court prohibited either party from drinking alcoholic beverages in the children's presence and prohibited appellee from allowing contact between Mr. Root and the children.

On September 13, 2011, the court entered its written order from the July 2011 hearing, granting appellee's motion for directed verdict and denying appellant's motion for change of custody. Also on September 13, the court conducted a hearing on appellant's ex parte petition. Testimony was given at the second hearing by the parties and by M., the parties' oldest child, whose testimony was taken in chambers.

M. testified that appellee and Mr. Root had continued to see each other after the July hearing. M. said that she used to see him every day when he brought his son to appellee's classroom, came to get his son from their house, and sometimes stayed for dinner, drinking beer most of the time while there. She said that she was concerned about Mr. Root because of police reports appellant had told her about but that she had already heard from H., Mr. Root's ex-stepdaughter, about his putting his hand around her neck and saying, "Don't make me choke you." M. testified that H. had told her the story at the camping trip, during which the adults were drinking. M. testified that she was uncomfortable with Mr. Root being around because he had put a choke-hold on her and she could not tell whether he was playing. She said that she had asked him to stop, that she had told appellee about what H. told her and about not feeling safe when Mr. Root put a choke-hold on her, that appellee had said she would talk to him about it, but that he had done it again.

M. also testified that her little sister asked appellant why he had taken appellee to court in July and whether he was trying to ruin their lives, that he left the room momentarily but returned, and that he said he had heard from somebody that Mr. Root was abusive and "a drunk." M. said that appellant did not show her the police reports and that she had never seen them. She said that when she asked appellant if he was mad or upset after court in July, he said that he was disappointed about not getting to share everything he knew and that "the judge didn't get to see the

papers." She said that it was hard for her to like Mr. Root and know the things appellant thought about him. She said that appellant told her about Mr. Root only after she told appellant about H., which was after court in July. M. testified that she felt safer at appellant's house, where she thought she and her siblings should live, but that appellee could make her more comfortable by listening and actually doing something about her discomfort.

Appellee testified, verifying that M. told her on the camping trip what H. had said and about being scared. Appellee testified that she had previously observed Mr. Root put choke-holds on M. while playing, that M. told her only that it annoyed M., and that appellee was not aware the choke-holds continued after she had talked to Mr. Root. She denied that she or he had been drinking on the camping trip, and she said the only cursing was directed toward a friend who cut his toe and initially refused to leave to get needed stitches. She said that her relationship with M. was strained; that M. had been comfortable with Mr. Root until hearing the story from his stepdaughter; and that the main problem started the last weekend in August 2011, when M. did not return from appellant's home Sunday night and stayed home from school the next day. Appellee said that she thought her children knew too much about the court procedure and that she spoke to them about it only to calm their fears.

Affidavits by appellee, Mr. Root, and Mr. Root's mother disputed that inappropriate behavior had taken place on the camping trip. An affidavit of M.'s school counselor, Billy Chesshir, stated that in August when she did not attend school, M. and appellant came to his office because she was upset about Mr. Root's police record, which appellant had shared with her; Mr. Root's anger, drinking, yelling, and cursing, which she had observed; and the choke-holds that made her uncomfortable. Mr. Chesshir reported that he had follow-up communications with M. and both her parents through September 9, 2011.

Appellant testified at the hearing that he filed the petition for emergency custody because of concerns that his daughter might be harmed. He stated that he had found seven police reports about Mr. Root, leading him to have concerns about his behavior around the children, but had not brought up the reports with them until talking with M. Appellant testified that he was concerned about Mr. Root's pattern of behavior, his putting his hands on M., her fear, the environment of instability for the other two children, and a concern that something would happen to them.

Appellant rested and appellee moved for a directed verdict, arguing that the parties' position remained unchanged from July. She asserted that appellant had failed to provide information of emotional or physical injuries to the children from anything that she had done. The court orally ruled that appellant had again failed to meet his burden of proof and that there had not been a material change of circumstances after the first hearing in July.

The court stated that it did not think appellant's actions in addressing the situation with his children had been appropriate, and further stated:

I don't see that you're helping anything the way you're handling the dissemination of information to your kids in this matter.

And I think part of the problem between then and now is ... you're not able to keep your, what appears to me an intense dislike for Mr. Root out of the way you talk to your children about him, and, you know, it's frightening. I

have no doubt that you're sincere in your beliefs, but the way you express those beliefs is scary, and I am not surprised your kids are scared by it. The court advised appellee to use her judgment and added:

I pray that she doesn't make a decision that comes back to haunt me on this, but based on what I've heard, it is Mr. Sisson's fears, and I don't think that justifies action on my part. So the previous order directing the kids not to be exposed to Mr. Root, I'm afraid has to be withdrawn.

I certainly hope that you consider your children's feelings in that regard and how you might choose to re-institute them to Mr. Root is delicate at best.

The court denied the petition for emergency relief on the basis of insufficient evidence to grant a change of custody, and it lifted the emergency no-contact order concerning Mr. Root and the children, observing that appellant's testimony was hearsay. A September 27, 2011 docket entry reflects that appellee's motion to dismiss was granted for failure to show a material change of circumstances since the last hearing and failure to show that a change of custody was in the best interest of the children.

### 1. *Dismissal of Appellant's Petition and Motion*

■ Appellant contends in his first point on appeal that the circuit court erred in dismissing his petition for change of custody and his subsequent motion for emergency relief. We agree with his arguments, and we reverse and remand on this point.

■ There is no requirement that the trial court wait until the children are actually harmed before finding that a material change in circumstances warranting a change in custody exists. *Boudreau v. Pierce*, 2011 Ark. App. 457, 384 S.W.3d 664. We direct our review to the circuit court's order granting appellee's dismissal of the motion to change custody—viewing the evidence in the light most favorable to the appellant as the nonmoving party, and giving the proof he presented its highest probative value and taking into account all reasonable inferences deducible therefrom. *See Wagner, supra.* The proof in this case viewed under these standards showed that appellee frequently allowed a man with whom she was romantically involved, who had been accused of violence against women and children, to be in the home with the parties' children and to be involved in family activities. The oldest daughter was uncomfortable with his behavior, in part after talking with his former stepdaughter about similar incidents.

The circuit court ruled that appellant's evidence was primarily speculative and, although his fears might prove to be well grounded in the future, his evidence did not satisfy his burden of proving a material change of circumstances that would warrant a change of custody. We agree with appellant that a prima facie showing of a material change of circumstances did not require him to show that the children had already suffered actual harm. The circuit court applied the wrong standard of law, erroneously relying on its conclusion that appellant was required to prove that the children had suffered an adverse impact from appellee's actions and judgment. We reverse and remand the case to the circuit court for further proceedings consistent with this opinion.

### 2. *Exclusion of Documents*

Appellant contends in his second point on appeal that the circuit court erred in excluding court documents concerning

Mr. Root. At the July 15, 2011 hearing, the circuit court upheld appellee's objections that appellant's proffered court documents concerning Mr. Root, provided to appellee two days before trial, were inadmissible because they had not been timely disclosed in discovery.

We will not reverse a circuit court's ruling on the admissibility of evidence absent a manifest abuse of discretion. *Poole v. Poole,* 2009 Ark. App. 860, 372 S.W.3d 420. To have abused its discretion, the circuit court must not only have made an error in its decision, but must also have acted improvidently, thoughtlessly, or without due consideration. *Id.* Here, we find no manifest abuse of discretion in the circuit court's decision to exclude the proffered court documents.

Reversed and remanded.

GLADWIN and ROBBINS, JJ., agree.