Cite as 2020 Ark. App. 550

# ARKANSAS COURT OF APPEALS
DIVISION II
**No.** CV-19-952

| | |
|---|---|
| VALERIE DENARVAEZ<br><br>APPELLANT<br><br>V.<br><br>ENRIQUE DENARVAEZ<br><br>APPELLEE | **Opinion Delivered:** December 9, 2020<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SEVENTEENTH DIVISION [NO. 60DR-14-878]<br><br>HONORABLE MACKIE M. PIERCE, JUDGE<br><br>DISMISSED IN PART; AFFIRMED IN PART |

**RITA W. GRUBER, Chief Judge**

Appellant Valerie Denarvaez appeals the circuit court's order granting her ex-husband Enrique Denarvaez's motion to modify custody and awarding Enrique primary custody of their six-year-old daughter, VD, subject to limited supervised visitation with Valerie. She brings three points on appeal arguing that the circuit court erred (1) by entering an ex parte order awarding custody to Enrique; (2) in modifying custody; and (3) in calculating child support. We dismiss point one and affirm on points two and three.

Valerie and Enrique divorced on August 6, 2014. They entered into an agreed custody, support, and property-settlement agreement, which provided that the parties would share joint legal custody of VD with Valerie to have primary physical custody. Enrique was given "reasonable visitation" to be scheduled by agreement of the parties on the basis of his work schedule. At the time of the divorce, Enrique worked as a deckhand

on a tugboat in New York Harbor and was out of state for several weeks and then home for several weeks. Throughout the events relevant to this appeal, Enrique has been married to Shawna and lives with her and her three children in Rogers; Valerie lives with her parents, Linda and William Phillips, in Jacksonville.

On August 9, 2018, Enrique filed a petition for modification of custody and for emergency ex parte relief. The court entered an ex parte order the next day placing temporary custody of VD with Enrique and setting a hearing for September 10. In his petition and attached affidavit, Enrique alleged that Valerie had been arrested on July 26 and charged with third-degree domestic battery and terroristic threatening for threatening to kill her father, William, and striking him in the back of the head. According to the police report, William had locked himself in the bedroom and called the police while Valerie stood outside the bedroom door kicking the door and cursing at William. The incident report said the call was received at 5:42 p.m., and the police were dispatched immediately. According to the report, Valerie's mother and William's wife, Linda, had witnessed the incident; she told the reporting officer that Valerie had taken money from William without his permission, had repeatedly said she wished he would die tonight, and then hit him on the head.

At the temporary hearing held on September 10, Jacksonville police officer Jordan Cline testified that she had been dispatched to a domestic disturbance on July 26 and had been informed that the victim, William Phillips, had locked himself in his bedroom because he feared for his safety and was waiting for police to arrive before coming out. Officer Cline said that she noticed William peeking out from the blinds when she drove up. She walked through an open garage door into the house and saw Valerie sitting in the living room. She

said that William came out of his room when she arrived. Officer Cline testified consistently with her report from the incident that William told her Valerie was screaming at him, hit him in the back of the head with something, and told him she would kill him. He told Officer Cline that he had locked himself in the bedroom and called the police. William had signed a written statement to that effect. Officer Cline said that Linda arrived at the house about thirty minutes after Officer Cline. Officer Cline testified that she was not told where Linda had gone, but she thought that Linda had VD with her "based off" what Valerie had told her. She believed Linda told her "that she had dropped [VD] off somewhere." She said that Linda appeared "frustrated," "angry," and "sad."

William testified that he did not remember calling 911 on July 26, did not recall the police showing up at his house, did not remember speaking to a police officer, did not remember Valerie saying she was going to kill him, and did not know who Officer Cline was. He testified that he was "sure" Valerie did not hit him and that she had never hit him. He said he did not know if his daughter was arrested on July 26, and he did not recognize his statement from that night but said the signature was probably his. Finally, he said he has PTSD and has trouble remembering significant events that had happened recently although he could remember things from long ago.

Linda testified that she witnessed a confrontation between Valerie and William on July 26 and remembered that William had called the police. She said that she left before the police arrived to "go for a drive." She said that she was not worried that her husband was in danger. She said that William and Valerie usually got along but that Valerie was in a lot of pain from a recent back surgery. Linda also testified that on the evening of the incident,

3

VD was with Ashley, the mother of Enrique's other daughter AD. Ashley and AD lived several blocks away from the Phillipses, and the two children spent a lot of time together. Linda admitted that she would have been worried if VD had been at the house during the incident. She returned to the house because William called her and told her the police officer wanted her to return.

Ashley Moussa, AD's mother, testified that Linda had dropped VD off before the incident occurred. She said that she received a text message at 6:18 p.m. on July 26 from Linda asking, "Are you home?" Ashley replied, "I'm in the neighborhood." At 6:19 p.m., Linda texted, "I am at your house," after which Linda dropped VD off with Ashley. According to the police report, this was approximately thirty-five to forty minutes after the police had been called.

Enrique testified that VD had handled the transition to his house well and that she had started kindergarten in Bentonville. He said that he kept Valerie up to date regarding VD with texts and phone calls. He said that Valerie had talked on the phone with VD two or three times a day since he had assumed custody. But he testified that Valerie did not always act appropriately in the phone calls and that he had asked her to stop talking about "adult stuff" such as lawyers, court, and other adult topics. He said that Valerie's texts had increased since he had custody of VD and that he had received about 1000 text messages since VD had been with him in Rogers. He said the texts were not always civil, polite, or respectful. He also said that Valerie had told him that she wished his "plane would die when [he] travel[ed] to work," that he was a "horrible father," and that she had called the police to his house for welfare checks several times.

At the close of the hearing, the circuit court specifically ordered Valerie not to discuss the case with VD. It also specifically found that William had not testified truthfully and that "the child was at the home when this occurred . . . grandmother didn't take her over there until all this incident blew up." The circuit court entered a temporary order on October 8, 2018, awarding Enrique temporary primary custody of VD subject to visitation with Valerie on alternating weekends. The court specifically found in its order that William's testimony was not credible. The court allowed the parties liberal phone visitation with VD when she was in the other parent's custody but cautioned Valerie not to have discussions with VD about "coming home" to her house and specifically prohibited the parties from discussing with VD whether either of their homes was permanent or temporary and from speaking with VD about the case or any related legal proceedings. The court set the matter for a final hearing on March 28, 2019.

At the final hearing, Enrique testified that VD is happy, has friends at school, and is doing well in Rogers with him. He said that VD has a good relationship with his wife, Shawna, and that she is clingy with Shawna when she returns from school or from a visit with Valerie. He testified that he had quit his job in December 2018 and was acting as a stay-at-home dad. He said that he and Valerie communicate through texts and phone calls and had spoken every day since VD had been with him. He said Valerie was always yelling, fighting, or arguing about something. He was also concerned about the phone conversations between Valerie and VD and complained that Valerie was berating, interrogating, and questioning VD. He said that VD puts his phone on speaker when she talks with Valerie and that he had recorded some of their conversations. Twenty-three of those recordings

5

totaling forty-eight minutes were played for the court, and transcripts of the recordings were also entered into evidence.

Shawna testified that Enrique is an excellent father and has a good relationship with all the children. She said her three children and VD also have a good relationship. She said that she works for Liberty Mutual Insurance and runs its Northwest Arkansas agency. She said she had never met Valerie but had texted with her. She said Valerie had sent threatening, harassing texts to her, her family, her children, and her work. Valerie had also gone "online" and said false things to hurt her business, which had necessitated the involvement of Shawna's business attorney. Valerie had sent Shawna multiple text messages about "research" she had collected on Shawna's family, her ex-husband, and her neighbors.

Brooke Dancer, the assistant principal at VD's Bentonville school, testified about contact with Valerie. She said that Valerie called her on August 15, 2018, and told her that Enrique had temporary custody only and that Ms. Dancer could not enroll VD in school. Valerie left a voicemail the following day telling Ms. Dancer to contact her attorney because VD was already enrolled in another school, that Enrique had temporary custody only, and that VD could not be enrolled in two schools. She left another voicemail stating that it was in Ms. Dancer's best interest not to have VD attend her school. The voicemails made her uncomfortable, so she informed district student services and the school resource officer, who contacted Valerie and asked her to stop calling. Ms. Dancer testified that VD is a sweet girl and always happy and that her attendance records and grades were "on track." In March 2019, several days before the final hearing, Valerie sent several emails to Ms. Dancer's boss, the principal at VD's school, stating that Ms. Dancer was an "outright liar" about what

Valerie had told her and offering to pay for Ms. Dancer to take a polygraph test because she was sure she would fail.

Valerie testified that although she had been arrested on July 26 for terroristic threatening and domestic battery, the charges had been dropped. She said that she had not hit or threatened her father and that VD had not been home during the incident. She admitted that she was not "proud" of the way she sounded on the recordings of her conversations with VD. She testified that she had called the Rogers Police Department four or five times in the ten months VD had been in Enrique's custody when Enrique did not answer his phone or return her call. She also admitted that she suffered from severe depression and anxiety and did not work due to a disability caused by degenerative disc disease. She said that she receives $1077 in monthly disability benefits and that VD also receives monthly benefits in the amount of $448 that Valerie directed into VD's 529 college savings account.

Kyla Farler, the attorney ad litem, recommended that VD remain in Enrique's custody. She noted that Enrique and Shawna provide a structured environment for VD, who is happy and playful and loves being with her stepsiblings. She said that VD had made new friends, loves her new school, and is thriving. She expressed concern that Valerie had "manipulated" VD by continually discussing where she should live; who she loved most; and about police, attorneys, and court, which Ms. Farler deemed inappropriate and unhealthy for such a young child. She opined it is in VD's best interest to remain in Rogers with Enrique and that Valerie should have reasonable visitation contingent on her ability to behave calmly and appropriately in front of VD. Ms. Farler also recommended that neither

parent interrogate VD regarding information about the other parent and that failure to keep phone conversations with VD limited to age-appropriate subject matter should result in the loss of telephone privileges.

At the conclusion of the hearing, the circuit court recalled its order from the temporary hearing at which it specifically found that the testimony of William Phillips was not credible and that VD was present during the incident for which Valerie was arrested on July 26. The court then stated that it was "clear you threatened to kill your father that day, in front of your child," which it noted was "a bad event. Any way you want to paint it[.]" The court said it moved custody to Enrique in that order as a result of Valerie's own conduct. The court recognized that its order prohibited the parties from discussing adult matters with VD, specifically about whether either of the parties' homes was permanent or temporary. Referring to the recordings of phone conversations in evidence, the court chastised Valerie for repeatedly and continuously engaging in the specific conduct the court had forbidden. The court found it intolerable that Valerie incessantly questioned VD about adult matters, called VD a liar, and told VD, "You act like your dad."  The court adopted the ad litem's report and specifically found it was in VD's best interest to remain in the full custody of Enrique and said that visitation with Valerie was dependent upon her conduct.

The court indicated that it would add together the disability benefits received by Valerie and VD to get Valerie's net income for purposes of child support, which the court noted would be $360 a month. Counsel then discussed whether VD's entire benefit check should simply be diverted to Enrique instead.

THE COURT:          Because that's significantly—under Section C of—Section 3, Section C, (as read) "Non-salaried payors for Social Security

8

|  | Disability recipients, the Court should consider the amount of any separate awards made to the disability recipient's spouse and children on account of the payor's disability. SSI benefits shall not be considered as income." |
|---|---|
|  | But for some reason in my mind, I'm thinking that there is a case that says that what—the way to do that is to add those two sums together and then set support based upon that. |
| ENRIQUE'S COUNSEL: | I—I agree, Your Honor. I and then I may be speaking out of school, but I think the case also says that if the support amount is less than the benefit, then no support is paid. |
| THE COURT: | And that—and, again, that—I'm thinking you're correct. So let me look at that. Ms. Denarvaez's testimony was that she does not keep that money. She puts it in a 529 plan. You know, that's fine at this particular juncture, but I'll ask that Counsel look at that amount on those two figures and make your argument as to what you think that I should do regarding child support. I will also tell you that I will retroactively award child support back to September— starting in September of 2018. |

On April 18, 2019, the court entered a final order, noting that it had found a material change in circumstances existed at the temporary hearing in September warranting its entry of a temporary order placing custody of VD with Enrique. The court found by clear and convincing evidence that it was in VD's best interest to be placed in the primary custody and control of Enrique subject to limited, supervised visitation with Valerie. The court also found that due to Valerie's behavior with VD during phone calls, she was not entitled to phone calls with VD but should communicate with her by sending messages through a coparenting app, which Enrique was to review and relay to VD if appropriate and then provide Valerie with the child's response. The court also required Valerie to submit to personal counseling and follow the reasonable advice and recommendations of the counselor. Finally, the court totaled the disability benefits received by Valerie and VD to

arrive at a net monthly income of $1539 for purposes of Administrative Order No. 10, which amounted to a child-support obligation of $360 per month. Because VD's disability benefit of $477 exceeded this amount, the court ordered Valerie to direct the entire child's benefit to VD and found Valerie should owe no additional child support to Enrique. The court also ordered Valerie to pay Enrique $2880 in back child support.

## I. *Ex Parte Order*

For her first point on appeal, Valerie contends that the circuit court erred by entering an ex parte order awarding custody to Enrique. She argues that neither Enrique nor the court followed the requirements of Arkansas Rule of Civil Procedure 65(b)(1) governing the issuance of temporary restraining orders. We note that she did not at any time make this argument to the circuit court. However, without determining whether this argument is preserved or a violation occurred, we dismiss the appeal on this issue.

A temporary order is terminated upon entry of a subsequent permanent order. *Vairo v. Vairo*, 27 Ark. App. 231, 234, 769 S.W.2d 423, 423 (1989). Here, the circuit court entered an order that included a final award of custody. Because the permanent order of custody superseded the ex parte and temporary orders awarding custody in this case, any decision on the merits of the temporary awards would have no practical effect on the rights of the parties. It is the duty of appellate courts to decide actual controversies that can be carried into effect not to give opinions upon controversies or declare principles of law that cannot be executed or that cannot have any practical effect in settling the rights under the decree rendered. *Id*. The matter is moot, and we dismiss it.

## II. *Material Change in Circumstances*

We turn to Valerie's second point on appeal that the circuit court erred in modifying custody. The primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. *Fox v. Fox*, 2015 Ark. App. 367, 465 S.W.3d 18. We perform a de novo review of child-custody matters, but we will not reverse the circuit court's findings unless they are clearly erroneous. *Taylor v. Taylor*, 353 Ark. 69, 110 S.W.3d 731 (2003). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. *Smith v. Parker*, 67 Ark. App. 221, 998 S.W.2d 1 (1999). Finally, we recognize and give special deference to the superior position of the circuit court to evaluate the witnesses, their testimony, and the child's best interest. *Id.*

Our standards for modifications of custody are more stringent than those for initial determinations of custody. *Nichols v. Teer*, 2014 Ark. App. 132, at 6, 432 S.W.3d 151, 155. This is to promote stability and continuity in the life of the child and to discourage repeated litigation of the same issues. *Id.* In order to change custody, the circuit court must first determine that a material change in circumstances has occurred since the last order of custody; if that threshold requirement is met, it must then determine who should have custody with the sole consideration being the best interest of the children. *Id.*

Valerie first argues that the circuit court did not make a finding that a material change of circumstances had occurred since the last custody order was entered. The court's order does not have to identify the factual basis supporting the material change in circumstances. *Davis v. Sheriff*, 2009 Ark. App. 347, at 4, 308 S.W.3d 169, 171. There is no evidence in

the record that Valerie requested specific findings pursuant to Arkansas Rule of Procedure 52 prior to the court's entry of its final order, and we will presume that the court made the findings necessary to support its decree. *See Guthrie v. Guthrie*, 2015 Ark. App. 108, at 7, 455 S.W.3d 839, 844; *Magee v. Magee*, 2013 Ark. App. 108. Moreover, when no specific findings are made, we may conclude under our de novo review that there was sufficient evidence from which the circuit court could have found a material change in circumstances. *Id*.; s*ee also Hamilton v. Barrett*, 337 Ark. 460, 989 S.W.2d 520 (1999). In any case, here, the court recognized in its order that it had determined at the temporary hearing that a material change in circumstances existed warranting its placement of temporary custody with Enrique. In its oral ruling at the conclusion of the final hearing, the circuit court recalled that it had specifically found the testimony of William Phillips not credible at the temporary hearing and that VD was present during the incident for which Valerie was arrested on July 26. The court said it had moved custody to Enrique as a result of Valerie's own conduct.

Valerie next argues that the evidence does not support a finding that there has been a material change in circumstances. She argues that the evidence surrounding the incident on July 26 that prompted the ex parte order temporarily modifying custody does not reach the level of a material change in circumstances because, she contends, there was no testimony or evidence showing that VD was at home during the incident, and the evidence does not support the court's factual finding otherwise.[1] She also argues that the recorded

[1]We reject as moot Valerie's argument that the court erred by "effectively" preventing her from testifying at the temporary hearing regarding VD's presence at the home when it indicated that she would not be allowed to enforce a Fifth Amendment privilege to refuse to answer questions if she testified. The court indicated that if she testified to anything more than "her name and address" she was "fair game" for questions. As we

phone calls of her conversations with VD were recorded after Enrique filed for and received an emergency ex parte order granting him temporary custody.

Change-of-custody decisions must be based on the particular facts and circumstances of each case in relation to the standard of the best interest of the child. *Hudgens v. Martin*, 2009 Ark. App. 462. In addition, credibility determinations are left to the circuit court, and we will not reweigh the evidence. *Glisson v. Glisson*, 2018 Ark. App. 21, 538 S.W.3d 864. Given these standards, we affirm the circuit court's finding that a material change in circumstances occurred.

We do not examine each finding cited by a circuit court in isolation; certain factors, when examined in the aggregate, may support a finding that a change in custody is justifiable, although each factor, if examined in isolation, would not. *Schreckhise v. Parry*, 2019 Ark. App. 48, at 6, 568 S.W.3d 782, 786. The court specifically found William's testimony not credible. The police report indicated that the 911 call was received at 5:42 p.m. and that police were dispatched immediately. Valerie's mother, who said she witnessed the incident, testified that she went "for a drive" before the police arrived. Ashley Moussa testified that she received a text message at 6:18 p.m. on July 26 from Linda and that Linda dropped VD at her house, several blocks from the Phillipses' home, shortly thereafter. As previously noted, we will not reweigh the evidence. In addition, Valerie's erratic and admittedly inappropriate behavior continued in her phone conversations with VD, her calls and emails to VD's new school, and her calls to the Rogers Police Department. After a de

---

mentioned above, the court held a final hearing before its final order modifying custody at which Valerie testified about the July incident, thereby mooting this argument.

novo review of the record, we hold there was no error in the court's decision to modify custody based on the best interests of the child.

Finally, Valerie contends that the recorded phone calls should not have been admitted into evidence. She argues that the federal wiretapping statutes prohibit their admission. She acknowledges that there is an exception to the prohibition against recording without consent for a parent who records a minor's conversation when acting in good faith in the best interest of the child, but she argues that it does not apply here because Enrique did not act in good faith. We review evidentiary errors for a manifest abuse of discretion. *Sisson v. Sisson*, 2012 Ark. App. 385, at 15, 421 S.W.3d 312, 320. To have abused its discretion, the circuit court must not only have made an error in its decision, but must also have acted improvidently, thoughtlessly, or without due consideration. *Id.*

Valerie recognizes that Arkansas courts have not ruled on this particular issue and cites our federal district court's decision in *Campbell v. Price*, 2 F. Supp. 2d 1186 (E.D. Ark. 1998), in support of her argument. While Valerie objected at trial to admission of the recordings on the basis of hearsay and because neither VD nor Valerie had consented to the recording, she did not mention the federal statute or the good-faith exception to the statute. The court made the following ruling on the issue.

THE COURT: Yeah, and—and the problem I've got with arguing—and I understand your objection and there is a federal statute that covers that and for the moment it—it escapes me, but I know exactly what you're referencing.

The problem is [VD] can't legally consent because she is not of age, and so she is a minor. And [Valerie's counsel], the point is well-taken. You know, the calls occur between phone calls on phones owned by the [Enrique] and [Valerie]. The phone call is made to [Enrique's] phone. He controls that phone. If he chooses

14

to record those conversations, it is his phone, his call to his phone, and he has the right to record those without the knowledge of anyone else on that telephone.

And if the child turns on speaker and then it is transmitted to anybody that may be within earshot, which is certainly a danger of any phone call we all make to anyone in this world now, anyone else would then be free, in my opinion, to record those conversations.

So, I'm concerned about the best interest of the child. I understand the technicality, but I'm going to overrule the objection. I'm going to let you proceed.

The court had broad discretion to allow the recordings. Moreover, the argument Valerie is making to this court was not made, developed, or ruled on by the circuit court. We will not consider an argument raised for the first time on appeal, and a party cannot change the grounds for an objection or motion on appeal but is bound by the scope of arguments made at trial. *Gooch v. State*, 2015 Ark. 227, at 7, 463 S.W.3d 296, 301. The circuit court must have the benefit of the development of the law by the parties in order to rule adequately on the issues. *Id*. We will not address an issue that is fully developed for the first time on appeal. *Id*.

### III. *Child Support*

Finally, Valerie argues that the circuit court clearly erred in its calculation of child support. She contends that although the court correctly calculated her net income based on the total of the disability benefit she receives and the benefit VD receives, the court erred in directing VD's entire disability check to Enrique for child support. The amount of child support dictated by the family-support chart is $360 per month, which the court recognized in its order. Valerie argues that the circuit court was not authorized to deviate from this

amount without specific written findings that the chart amount was "unjust or inappropriate."

We review domestic-relations cases de novo on the record, and we will not reverse a finding of fact by the court unless it is clearly erroneous. *Hunter v. Haunert*, 101 Ark. App. 93, 97, 270 S.W.3d 339, 343 (2007). However, when the amount of child support is at issue, we will not reverse the circuit court absent an abuse of discretion. *Ryburn v. Ryburn*, 2014 Ark. App. 108, at 6, 432 S.W.3d 102, 106. Arkansas Code Annotated section 9-12-312(a) (Supp. 2019) directs a court to make an order "concerning the care of the children" that is "reasonable from the circumstances of the parties and the nature of the case." There is a rebuttable presumption that the amount set forth in the family-support chart of Administrative Order No. 10 is the correct amount. *Bass v. Bass*, 2011 Ark. App. 753, at 4, 387 S.W.3d 218, 221.

The court's order recognizes that Valerie's child-support obligation pursuant to the family-support chart is $360. The court found that because VD's benefit payment exceeded that amount, the entire benefit should be directed to Enrique and Valerie "shall owe no additional child support" at this time. Administrative Order No. 10 provides that the court may deviate from the chart amount if it enters written findings stating why, after consideration of all relevant factors including the best interests of the child, the chart amount is unjust or inappropriate. Ark. Sup. Ct. Admin. Order No. 10(I) (2019).

At the conclusion of the final hearing on March 28, counsel and the court specifically discussed child support and how it should be calculated under the particular circumstances of this case where VD receives a separate Social Security benefit check due

16

to Valerie's disability. Indeed, Valerie admits in her brief that the court specifically requested counsel to submit additional arguments on the matter. Neither party submitted additional argument, and the court entered its final order on April 18. Valerie did not argue at trial that VD's entire benefit should not be diverted to Enrique nor did she present additional argument to the court on the matter. We will not consider arguments raised for the first time on appeal. *See McWhorter v. McWhorter*, 351 Ark. 622, 629, 97 S.W.3d 408, 413 (2003).

For the reasons set forth herein, we affirm the circuit court's order.

Dismissed in part; affirmed in part.

ABRAMSON and HIXSON, JJ., agree.

*Davidson Law Firm*, by: *Joshua M. Allen* and *Charles Darwin "Skip" Davidson*, for appellant.

*Rhoads & Armstrong, PLLC*, by: *Mary Goff*, for appellee.